**In re Ray Gordon DAVENPORT, and Carolyn Jean Davenport, Debtors.**

**Bankruptcy No. 989–02119.**

United States Bankruptcy Court, E.D. California.

April 10, 1992.

Carl W. Collins, Altman, Collins & Gross, Modesto, CA, for debtor.

William M. Parish, Stockton, CA, for objecting party.

CORRECTED MEMORANDUM OF DECISION RE: CONFIRMATION OF DEBTORS' THIRD AMENDED PLAN

JOSEPH W. HEDRICK, Jr., Bankruptcy Judge.

This matter came before the court on the requested confirmation of debtors' third amended Chapter 12 plan of arrangement and the objections of Western Farm Credit Bank and Sierra–Bay Federal Land Bank Association thereto.

### FACTS AND BACKGROUND

Sierra Bay Federal Land Bank Association ("Bank") objections to confirmation focus on treatment of its secured claim. Bank's secured claim arises from a loan note which had an outstanding balance of $469,245.00 at commencement of debtors' chapter 12 case. Bank's note is secured by (1) a first deed of trust on 24.22 acres of farm land, including debtors' residence, which by final order of the court, has a fair market value of $354,462.00; (2) a security interest in a note executed by Wayne and Nina Cheung in favor of the debtors in the amount of $47,985.14; and (3) a lien granted by law on class B/C Bank stock which debtors were required to purchase to acquire the loan from Bank.

Debtors' plan allows Bank's claim secured status in the amount of $402,447.14, being the real property value of $354,462.00, plus the value of the Cheung note receivable in the amount of $47,985.14. Debtors, however, assign no value to the stock for purposes of classification as a secured claim.

Debtors propose to pay the $354,462.00 value of the real property outside the plan at 10% per annum interest over a period of thirty years in equal annual payments of $37,601.33 beginning on December 31, 1991. The Cheung note would be immediately surrendered to Bank to proportionately reduce the secured claim pursuant to 11 U.S.C. 1225(a)(5)(C). Similar to the Cheung note, debtors' plan reserves the right to apply to the court for surrender of the Bank stock and application of the proceeds to Banks' secured debt. The plan further provides for retention by Bank of its liens until the secured claim is paid in full. The deficiency balance of the Bank's claim is then to be treated as an unsecured claim.

Bank has raised the following objections to debtors' proposed plan:

(1) that debtors understate Bank's secured claim by omitting the value of the stock which is alleged to be part of the collateral;

(2) that debtors illegally seek to reserve the right to offset the Bank stock against the debt due Bank;

(3) that the plan is ambiguous in that it seeks to reserve the right to offset a favorable result in a pending action solely against the secured claim of Bank's claim rather than the entire claim of the Bank;

(4) that the plan is not feasible; and

(5) that the provision in the plan fixing an interest rate of 10% over thirty years for repayment for the portion of Bank's secured claim secured by the real property is impermissibly low.

Finally, Bank also requests that in the event the plan is confirmed, that it be on condition upon any default the stay will be deemed vacated upon ten days notice to debtors and their counsel.

### DISCUSSION

1. **Amount of Secured Claim**

2. **Right to Offset Value of Stock**

At the time of making the loan, debtors were required to purchase Bank's class B/C stock equal to 6% of the principal amount of the loan. By statute, a lien was granted on the stock in favor of Bank. Debtors and Bank agree that the stock, valued at its $5/share par value is, or would be, worth $23,165.

Debtors contend that for purposes of determining the secured claim of Bank, the value of the stock should be determined at zero. Debtors base this contention on the facts that the stock is non-voting, non-transferrable, and surrender or redemption

is purported by Bank to be restricted by statute. Notwithstanding that debtors deem the stock worthless, debtors reserve the right to surrender the stock in satisfaction of whatever portion of Banks' secured claim secured by the purportedly worthless stock.

Bank does not dispute that the stock is non-voting, non-transferable, and subject to surrender or redemption at the Bank's sole discretion. However, Bank maintains that the full par value of the stock should nevertheless be used to determine the amount its secured claim. Accordingly, Bank raises the failure of debtors' plan to include the value of the stock in determining Banks' secured claim and inclusion of a reservation of rights to surrender the stock as improper and objectionable.

It appears to the court that the value of the stock and the right of debtors to surrender the stock are inseparably related. Whether the stock has value which can be used to determine secured status depends on what, if any, disposition or use the estate or debtors may make of it. The parties agree that stock is non-voting and non-transferable and it seems that the only source of value for the stock depends on whether or not it may be surrendered or redeemed to satisfy the very debt which was used to buy it.

There is a minority line of cases which would appear to support the Bank's position that under the farm credit system surrender or redemption is proper only at the discretion of the Bank. The majority line of cases, however, support debtors' position that Chapter 12 plans may properly provide for surrender of the stock prior to retirement of the debt. Some of the cases setting forth the majority view are as follows:

*In re Cansler,* 99 B.R. 758 (W.D.Ky. 1989)

*In re Neff,* 89 B.R. 672 (Bankr.S.D.Ohio 1988)

*Matter of Arthur,* 86 B.R. 98 (Bankr. W.D.Mich.1988)

*In re Massengill,* 73 B.R. 1008 (Bankr. E.D.N.C.1987), *reversed in part,* 100 B.R. 276 (E.D.N.C.1988)

This court determines to follow the majority line in this case. The rational of the majority position is sufficiently set forth in the above-cited cases, and a further recitation thereof in this decision would serve no useful purpose. The court will, however, comment briefly on the rationale of the minority, which it finds unconvincing.

 The minority line of authority rests in large part upon questionable applications of three basic rules of statutory construction. These rules are: (1) statutes must be read to give full effect to the purposes of each; (2) if there exists a conflict, the specific controls the general; and (3) that repeals by implication are not favored.

First, the statutes involved herein do not appear to be in conflict and *can* be reconciled so as to give effect to the purposes of both. The Farm Credit Act and Chapter 12 of the Bankruptcy Code are as different as proverbial apples and oranges and deal with entirely different subject matters having completely different purposes. The Farm Credit Act provides for the creation of the federal land bank system and governs the routine operation of land banks in the ordinary course of business. Its purpose is to provide the availability and administrative framework for farmers to obtain credit. Chapter 12 of the Bankruptcy Code, on the other hand, is emergency legislation of very short duration designed to grant specific broad powers to a specific and relatively small group of debtors and is designed to alleviate the hardships to family farmers imposed by a specific economic crisis. That the Bankruptcy Code gives debtors a statutory right to modify debtor/creditor relationships established under the Farm Credit Act does not, in this court's opinion, frustrate the purposes of either. Accordingly, this court finds that no conflict exists between the two distinct acts their purposes being separate and distinct.

Second, the rule of construction that the specific controls the general where there is

a conflict would not mandate the result reached by the minority. As set forth above, there is no conflict of statutes in this case, so the rule is not even applicable. Cases relied upon by the minority for this principle are inapplicable to this case. For example, in *Morton v. Mancari*, 417 U.S. 535, 550–51, 94 S.Ct. 2474, 2482–83, 41 L.Ed.2d 290 (1974), a case heavily relied on by the minority, one statute established a general right of appeal, and the other a rule restricting appeal in certain cases— apples and apples. As the court has already noted, this case deals with statutes with dissimilar purposes and effects—apples and oranges—and the rule should not even be applied as no conflict exists. But even if there were a conflict between the Farm Credit Act lending laws and regulations and the Bankruptcy Code, the court considers the Bankruptcy Code to be the more specific. The Farm Credit Act creates a method for obtaining financing and sets up certain procedures for incurring and refinancing debt by farmers generally. Upon the intervention of a Chapter 12 bankruptcy case, the Code grants specific rights to debtors in dealing with property of the estate and with secured creditors. Debtors are specifically authorized to surrender property securing a claim to the holder as a proper way to treat a secured creditor in a Chapter 12 plan. 11 U.S.C. § 1225(a)(5)(C). Although the Farm Credit Act laws and regulations may be more detailed, it does not necessarily follow that they are more specific and, thus, more applicable to the circumstances.

Finally, the repeal by implication argument is not well-taken under the facts of the within case. The Farm Credit Act of 1971 was not designed or drafted to deal with the rights of Chapter 12 debtors. Congress could not have had Chapter 12 of the Bankruptcy Code in mind at the time since it was not enacted until October 27, 1986. Chapter 12, on the other hand, was expressly enacted with bankruptcy relief for family farmers as its purpose. The farm credit system is designed to extend credit to farmers. It is, therefore, reasonable to expect that Congress was aware of the Farm Credit Act when it drafted the provisions of Chapter 12 dealing with treatment of secured claims including those created under the farm credit system. Had Congress intended to restrict those rights, it could have done so.

Based on the foregoing, the court determines that debtors may surrender the Bank stock as part of their plan pursuant section 1225(a)(5)(C). Because debtors may redeem the stock, the court also determines that the stock has value to the estate (albeit only for the purpose of cancelling the secured debt) and will require debtors to amend the amount of Bank's claim designated as secured to reflect the value of the stock.

### 3. Objection of Ambiguity

The issue of the claimed ambiguity of the plan has been resolved in this case by clarification, made on the record, and no further discussion is necessary.

### 4. Feasibility

The evidence and budgets submitted by debtors clearly establish that the plan is feasible. The budgets are essentially based upon the debtors' performance records over the past five years. The debtors are performing all necessary cultural practices, and the evidence is that their grape vineyard is in good condition and properly cared for. While any farming operation is subject to loss on occasion, that is a risk to which all such operations are subject. The evidence establishes and the court finds that the plan is feasible.

### 5. Rate of Interest

Bank argues that the proposed discount rate of interest in the amount of 10% per annum is too low and argues for a 12.25% rate.

One appropriate method for determining market interest rate is for the court to take evidence of prevailing rates for loans of similar term and risk. An alternative method is the formula method. Such method directs that the court start with some base rate and adjust for the risk

factor. *In re Fowler*, 903 F.2d 694 (9th Cir.1990). The risk is lessened by the existence of the Chapter 12 proceeding. *In re Camino Real Landscape Maintenance Contractors*, 818 F.2d 1503, 1508 (9th Cir. 1987). Whatever method is used, the Bankruptcy Court determination of the appropriate rate is accorded substantial deference. *In re Camino Real*, 818 F.2d at 1508.

Evidence of market rate was offered that fifteen year/due in fifteen years residential fixed rate loans were available back in October of 1991, for 7.875 to about 8.875. The quotations were based upon $100,000 loan amounts with 20% down.

The prime rate at that time was 8%. The Federal Reserve discount rate was 5%.

A competition rate survey put in evidence by the Bank dated September 13, 1991, noted that the cost of funds for Banks was falling and a corresponding drop in the prime rate was expected. Quotes on country home loans back in August/September of 1991 on 15 and 30 year loans was 9.02%. Intermediate term farm loans had an average spread over prime of 2.16%.

■ The budget establishes the feasibility of the plan and on confirmation the Chapter 12 protection will be in place. The court finds that the loan risk is average. The court further finds and concludes that the debtors' proposed discount rate of 10% is proper, provided that the term is shortened. The court will accept the 10% rate provided the plan is amended to make the secured obligations to the bank amortized over 30 years, but all due and payable in 20 years.

### CONCLUSION

If the plan or order confirming the plan amends the plan, as hereinabove set forth, the court will confirm the plan. If not, the court will deny confirmation.

The request of the Bank for automatic stay relief in event of default under the plan is denied as not having been properly before the court or justified by the facts of the case as they presently exist.

The foregoing sufficiently sets forth the basis of the court's decision. Counsel for debtor is directed to prepare an appropriate order in accordance herewith.