**In re Lloyd R. HONEYMAN and Sherry K. Honeyman, Debtors.**

**Bankruptcy No. 96–30208.**

United States Bankruptcy Court,
D. North Dakota.

Oct. 4, 1996.

Ross H. Espeseth, Bismarck, ND, for Lloyd R. Honeyman, Sherry K. Honeyman.

Wayne Drewes, Trustee, Fargo, ND.

### MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The matter before the court is confirmation of the Debtors' second modified Chapter 12 plan filed August 9, 1996. AgriBank, FCB, (AgriBank), the Debtors' principal secured creditor, filed objections to the plan and additionally has filed a motion to dismiss the case on grounds that there is no reasonable prospect for reorganization. The motion for dismissal came on for hearing in

conjunction with the confirmation hearing—both held on September 10, 1996, and both are addressed in this order. From the evidence presented the court makes the following findings and conclusions:

### 1.

Lloyd Honeyman and his wife, Sherry, are engaged in a small grain and cattle operation in Adams County, North Dakota. Presently age 65, Lloyd has been farming for forty years and, despite a heart attack in 1993 and related health problems, he plans on carrying on with the physical demands of farming for another 15 years. In past years the Debtors have farmed 1,119 acres and maintained a herd of Angus/Hereford cross. Historical income and expense data reveal that the operation has been deteriorating. In each of the last five years 1991 through 1995, the Debtors have experienced net losses. This situation culminated in a foreclosure proceeding being commenced by AgriBank in July 1995. That action resulted in a judgment of foreclosure being entered on December 11, 1995 against all of the Debtors' real property. The state court also determined AgriBank to have a lien in the sum of $249,278.67, this being the amount due and owing upon the mortgage indebtedness as of November 21, 1995. In an effort to forestall further proceedings and, hopefully, resurrect their operation, the Debtors filed for relief under Chapter 12 on February 22, 1996.

For the current 1996 farming season the Debtors have rented out all of their own land, receiving $30.00 per acre for 225 acres of crop land and $20.00 per acre for pasture. They grow spring and durum wheat on 240 acres of land rented from others and have scaled back the cattle operation from 100 head to 40 cow/calf pairs. Placing great reliance upon current near-record wheat prices, the Debtors have crafted a plan by which they hope to carry on with a scaled-down operation for another 25 years.

### 2.

*The Plan and Claim Treatment.*

The Debtors' second modified plan divides the secured creditors into four classes with AgriBank constituting Class I. Class IV, a claim held by West River State Bank secured by livestock, is to be paid within thirty days of confirmation. Otherwise, the remaining three secured classes are amortized over terms ranging from three years to twenty-five years in the case of AgriBank. Assuming confirmation occurs on or around October 1, 1996, the Debtors' operation will need to generate $29,335 to meet plan payments due in 1996 (assuming three month's interest at 10.5% on $225,000 principal due AgriBank). The following year, 1997, may be regarded as the first full plan year with annual plan payments becoming $35,328 inclusive of $25,746 payable to AgriBank.

AgriBank is fully secured with its claim being in the amount of $257,052.42 secured by a mortgage (now foreclosed) upon all 1,119 acres plus a security interest in Agri-Bank stock worth $7,500. The plan recognizes the secured status of the claim only to the extent of the real estates value of $225,-000 and, without any acknowledgement of the stock, treats the $32,052 balance of the claim as unsecured. The plan does not fully preserve AgriBank's state court judgment but rather, provides that upon the Debtors receiving a discharge any judgment held by an unsecured creditor shall be satisfied. Agri-Bank resists this treatment charging first of all that the plan, in failing to recognize the stock, understates its secured claim which should be $232,500.

The plan accords the claim a 10.5% fixed rate of interest for 1997 through 2000 amortized over 25 years and thereafter a variable rate through December 31, 2006, with a balloon payment on that date.

Recently, the Eighth Circuit in *In re Roso*, 76 F.3d 179 (8th Cir.1996) held that § 1325(a)(5)(B)(ii) (identical to § 1225(a)(5)(B)(ii)), requiring that the value of property to be distributed under the plan on account of a secured claim be not less than the allowed amount of the claim, means that such claims receive a "market rate of interest." Earlier the circuit court said:

"The appropriate discount rate must be determined on the basis of the rate of interest which is reasonable in light of the risk involved. Thus, in determining the discount rate, the court must consider the prevailing market rate for a loan of a term

equal to the payout, with due consideration for the quality of the security and the risk of subsequent default."

*United States v. Doud,* 869 F.2d 1144, 1146 (8th Cir.1989).

It therefore follows that the most appropriate interest rate is the current market rate for similar loans made in the region at the time of confirmation. *See In re Rott,* 94 B.R. 163, 168 (Bankr.D.N.D.1988); *In re Konzak,* 78 B.R. 990, 992 (Bankr.D.N.D.1987). Often termed the "coerced loan" theory, it is the rate a regional lender would charge on similar loans made to persons similarly situated in the open market, absent the fact of bankruptcy. *In re Claeys,* 81 B.R. 985, 993 (Bankr.D.N.D.1987). The 10.5% rate proposed in the plan is proffered without any evidence as to how it was arrived at. On the other hand, the uncontested testimony of AgriBank's senior credit officer is that Agri-Bank offers different rates depending upon a variety of factors and that given the Debtors' situation they would, at best, qualify for a tier 3 rate which is presently 12.28% fixed for three years and 12.51% fixed for five years. The Debtors failed to challenge this testimony which serves to establish that the current market rate of interest for a similarly fixed rate loan with similar risks in this region is, at best, 12.28% fixed over three years. Based upon the evidence and guided in its determination by recent circuit decisions, this court believes that the Bank's claim must be amortized at a fixed rate of 12.28% over twenty-five years for the first three years (1997–2000) because it is reflective of the market rate for fixed rate loans of similar term and quality in the area.

■ Section 1225(a)(5)(B)(ii) requires that a secured creditor receive the present value of its secured claim. Hence, a plan cannot be confirmed that gives a creditor less than that value. AgriBank charges that its secured claim includes its stock which the Debtors were required to purchase in order to obtain a loan. This stock is non-voting, non-transferable and its surrender or redemption is restricted by the Farm Credit Act. The Debtors are of the view, apparently, that the stock is therefore worthless and is to be disregarded in calculating what the value of

AgriBank's secured claim is. The value of the stock is, according to testimony of the AgriBank officer, determined at the time the loan is made and is based upon 10% of the amount borrowed. Although non-transferable, it does have value to the borrower because the last loan payment is reduced by the amount of the stock. In other words, its value lies in its ability to either wholly or partially satisfy the debt used to purchase it. Because of this fact, the court must conclude that the stock has value to the estate and accordingly the secured claim of AgriBank must reflect the value of the stock. *See generally, In re Davenport,* 158 B.R. 830 (Bankr.E.D.Cal.1992). With this adjustment the value of AgriBank's secured claim becomes $232,500 rather than the $225,000 as the plan presently proposes.

■ That part of the plan providing that upon discharge, judgments held by unsecured creditors shall be satisfied does not implicate any portion of AgriBank's secured claim. Although not entirely clear from the plan, it seems that the discharge under § 1228 does nothing more than to satisfy the unsecured portion of AgriBank's judgment. This is a partial satisfaction in the sum of $25,552.42, adjusted for the increased secured claim. This provision is nothing more than an expression of what is provided for by law. Section 28–20–30 of the North Dakota Century Code allows for the satisfaction of a judgment existing as of the date of bankruptcy by the filing of a certified copy of the discharge with the state clerk of court. As satisfaction is not a vacation and this court would not interpret the plan provision as resulting in either a vacation or full satisfaction of AgriBank's judgment of foreclosure, that judgment would remain to the extent of the unsatisfied secured claim.

### 3.

### *Feasibility*

As adjusted for the plan infirmities found to exist in connection with AgriBank's claim, Class I must be recognized as a claim of $232,500 amortized over twenty-five years at 12.28% with the first full payment commencing on December 31, 1997, and continuing through 2000 in the amount of $29,963.83 per

annum. The total cash requirement needed to fund the plan in 1997 and thereafter is $39,757 rather than $35,328 as projected by the Debtors.

 AgriBank further objects to confirmation of the second amended plan on the grounds that it is not feasible given the historical profitability and the payments required by the plan. The feasibility requirement is found in § 1225(a)(6) of the Bankruptcy Code which provides for confirmation of a plan if it appears "the debtor will be able to make all payments under the plan and to comply with the plan." 11 U.S.C. § 1225(a)(6). In determining whether a plan is feasible the court must scrutinize it terms and determine whether, in view of the debtor's likely income and expenses, it offers a reasonable prospect for success. *In re Monnier*, 755 F.2d 1336 (8th Cir.1985); *In re Anderson*, 52 B.R. 159 (Bankr.D.N.D.1985). While a plan need not promise a guarantee of success, there must be a probability of success. *Monnier* at 1341. The court must be persuaded that it is probable that a plan will be able to cash flow based upon realistic and objective facts (as opposed to visionary or overly optimistic projections). *In re Oster*, 152 B.R. 960 (Bankr.D.N.D.1993); *In re Dittmer*, 82 B.R. 1019 (Bankr.D.N.D. 1988); *In re Fenske*, 96 B.R. 244 (Bankr. D.N.D.1988).

The Debtors' plan is premised upon a scaled-down farming operation wherein the Debtors will cash rent all of their owned farmland and raise wheat on 240 rented acres. Crop income projection over the life of the plan is fixed at 21 bushels per acre at $5.00 per bushel. The historical county yield average is 20 bushels per acre. Although wheat prices at one point in 1996 exceeded $5.00 per bushel, the price has fallen and as of September 1996, spring wheat was selling for between $3.74 and $3.88 per bushel while durum was going for around $4.50 per bushel. According to AgriBank's witness, market prices are not likely to reach $5.00 again in the near future and, at best, he estimated spring wheat prices might move up to $4.10 to $4.35 per bushel over the next four months

and durum might see a price $4.70 per bushel over the same period.

At present the Debtors have 40 cow/calf pairs and the plan is premised upon the sale of 40 head per year at $400 each, without any allowance for death loss which, according to the AgriBank witness, normally runs 2–3% per year. The calf crop, according to Lloyd's testimony is usually 50% female which, according to AgriBank's witness, bring less than males at market. Lloyd himself testified that while steers would bring $400 hefers would probably go for $325 per head. The average per head price in 1995, according to AgriBank's witness, was $336 and in 1994 it was $370 dollars. According to him, a more realistic cattle price would be in the range of $350 to $370 per head.

The Debtors received CRP income of $7,500 annually and received farm program payments of $2,700. They also receive social security income of $520 per month.

Although overall expenses are reduced due to elimination of the 1100 acres, the per acre expense on the cultivated 240 acres will be the same as in past years. Over the preceding five years, farm-related expenses, with depreciation omitted, have averaged $58,000 per year. The Debtors reduced operation projects elimination of many of these historical expense items and they intend to provide for all operating expenses by means of a $14,000 operating loan, believing this sum sufficient to cover all farm-related expenses. Operating expenses, when coupled with annual living expenses of $18,000 results in total projected expenses of $32,000 according to the Debtors. If their estimation of operating expenses is accurate, it would leave available $33,000 for debt service (using what the court believes to be accurate income figures).

However, the elimination of some expense items appears to be either impractical or contrary to good practice. In the past they have incurred hired labor expenses as high as $16,000 in 1995. For the future, despite age and previous heart problems, Lloyd intends to go it alone, professing not to need a hired man anymore. Nothing in their projection is allocated for fertilizer, chemicals, fuel, insurance, seed, repairs, maintenance, utilities or veterinary fees. The court must

agree with AgriBank's witness that the Debtors' farm expense projections are unrealistic and not reflective of what has occurred in past years nor of what will likely be required in the future. From past year's experience and based upon 240 tilled acres and expenses incidental to the production of 40 calves per year, AgriBank's witness figured total operating expenses at $28,000 including $5,145 for hired help. Assuming Lloyd is able to do without a hired man (which the court believes is highly unlikely), it still leaves operating expenses at approximately $22,800. Based upon the hearing testimony and income and expense data received into evidence, the court believes AgriBank's figures more accurately reflects what the Debtors' true experience will likely be. Historically, living expenses for the Debtors over the preceding five years have averaged $18,000 and there is nothing in evidence to convince the court they will be any less than this in succeeding years.

Based upon data received in evidence, the court believes, consistent with the foregoing discussion, that a projected income statement reflective of what likely will be the Debtors' experience in future years can be arrived at as follows:

## INCOME

Crop

| | | |
|---|---|---|
| 2520 bu. spring @ 4.50/bu | 11,340 | |
| 2520 bu. durum @ 4.50/bu. | 11,340 | |

Livestock

| | | |
|---|---|---|
| 20 head male @ 400 | 8,000 | |
| 20 head female @ 325 | 6,500 | |
| Government payments | 10,237 | |
| Social Security | 6,240 | |
| Other farm income | 11,750 | |
| *Total Revenue* | | 65,407 |

## OPERATING EXPENSES

| | | |
|---|---|---|
| Chemicals | 760 | |
| Fertilizer | 1,368 | |
| Freight & trucking | 206 | |
| Gasoline, fuels & oil | 3,100 | |
| Insurance | 875 | |
| Interest on operating loan | 1,000 | |
| Land rent | 3,500 | |
| Repairs | 2,480 | |
| Seed | 1,400 | |
| Taxes | 2,170 | |
| Utilities | 2,000 | |
| Veterinary | 250 | |
| Other | 3,700 | |
| *Total Operating Expense* | 22,809 | |
| *Living Expenses* | 18,000 | |
| *Total Expenses* | | 40,809 |
| *Net Available For Debt Service* | | 24,598 |

From the foregoing, it is apparent that when realistic income and expense data is utilized, the Debtors' likely expenses will leave insufficient money available to make even the limited plan payments required in 1996 to say nothing of succeeding years. Even allowing for a margin of error in the court's income and expense analysis and giving the Debtors the benefit of the doubt on livestock and crop income, there is no realistic prospect for the Debtors' operation to generate a cash flow sufficient to make the payments required under the plan. Indeed, the plan falls short even when accepting the Debtors' own annual operating expense figures. Using that expense data leaves $33,000 available for debt service which is still insufficient to fund the first year cash requirement of $39,-757.

Under the feasibility standards by which the court must analyze the Debtors' plan projections, there is but one conclusion, that the Debtors' second amended plan does not meet the feasibility requirement of § 1225(a)(6). For this reason and owing also to the deficiencies noted in the treatment accorded AgriBank, the plan cannot be confirmed.

### 3.

This case has been pending since February 1996 with the plan under consideration being the most recent of three proposed. Given the historical results of the Debtors' past operation and the financial realities of the Debtors' likely future operation, it appears that under any scenario the income, even in a year with high grain prices, will not be sufficient to fund any plan. Accordingly and for the reasons stated confirmation of the Debtors' second amended plan of reorganization under Chapter 12 is DENIED.

Further, the motion of AgriBank, FCB for dismissal of this Chapter 12 case is GRANTED and the case is in all things DISMISSED.

**SO ORDERED.**