**In re Allen WALD and Debra Sue Wald, Debtors.**

**Bankruptcy No. 96–31119.**

United States Bankruptcy Court,
D. North Dakota.

March 12, 1997.

---

9. *See Kennon v. Camp,* 353 S.W.2d 693, 696 (Mo.1962).

Kip Kaler, Fargo, ND, for Debtors.

Jon Brakke, Fargo, ND, for Agri Bank, FCB.

Roger Minch, Fargo, ND, for Security State Bank.

Wayne Drewes, Fargo, ND, Chapter 12 Trustee.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The matter before the court is a Motion For Relief From Stay filed on January 16, 1997, by Agri Bank, FCB (Agri Bank). Security State Bank of Edgeley (SSB) joined in this motion on January 30, 1997. These creditors seek relief from the automatic stay against the Debtors' farm real property upon which they both hold a mortgage. Agri Bank bases its motion upon section 362(d) of the Bankruptcy Code and asserts that cause exists to lift the stay as the Debtors are incapable of reorganizing. In addition, Agri Bank asserts the operation of a stipulation entered into between itself and the Debtors in a previous bankruptcy case mandates the stay be lifted. SSB also maintains that cause exists to lift the automatic stay as the Debtors are unable to reorganize their farming operation. Further, SSB asserts this case ought to be dismissed as the Debtors filed it in bad faith. The matter came on for final hearing on February 12–13, 1997, and from the record in the case, the testimony and exhibits received at the hearing, the facts as relevant are as follows:

1.

The Debtors, Allen and Debra Sue Wald, have filed three petitions under Chapter 12 of the Bankruptcy Code. The first was filed on June 1, 1993,[1] one day before a foreclosure sale was scheduled. In February of the following year, Walds and Agri Bank entered into an agreement whereby Agri Bank could immediately institute foreclosure proceedings if Walds defaulted upon their payments to Agri Bank. The stipulation was approved by an Order entered March 16, 1994 and incorporated into the Debtors' plan which was confirmed on October 11, 1994. The Plan stated:

\* \* \* \* \* \*

A Stipulation was entered into between FCB and the Debtors in the Debtors' previous Chapter 12 Bankruptcy proceeding, Case No. 93–30455 ... which Stipulation provided that the terms of the agreement with FCB shall be binding on the Debtors in the previous Chapter 12 proceeding and in all other subsequent or further bankruptcy insolvency or reorganization proceedings in which the Debtors jointly or severally are involved....

\* \* \* \* \* \*

As additional security, the Debtors stipulate that if they default with respect to

---

1. Bankruptcy No. 93–30455.

their payments or other obligations concerning the reamortized FCB debts and the right to cure period expires without any default being cured, then FCB may immediately institute court foreclosure proceedings based upon the existing defaults under the above-referenced notes and mortgages ... without further notice of hearing to the Debtors and that FCB may thereafter proceed at Sheriff's sales to sell the mortgaged real estate.

\* \* \* \* \* \*

On March 23, 1994, the court granted Walds' motion to dismiss the 1993 case. However, that same day, Walds filed another Chapter 12 petition[2] which eventually produced a confirmed plan that incorporated the terms of the above-described stipulation. By July 25, 1995, the trustee moved to dismiss the second case based upon Walds' delinquency in making plan payments. An order dismissing the second case was entered on December 19, 1995. Again, this left occasion for the real estate foreclosure proceedings to resume which became scheduled for September 4, 1996. Again, Walds took advantage of the automatic stay by filing the present Chapter 12 petition on September 3, 1996.

2.

Agri Bank seeks relief from stay pursuant to 11 U.S.C. § 362(d)(1) of the Bankruptcy Code. Section 362(d) provides:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay-

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest;

First, Agri Bank asserts "cause" exists to lift the automatic stay based upon the above-described stipulation. The stipulation provides that Agri Bank may institute immediate foreclosure proceedings in the event of default. Under the terms of the stipulation, since the Walds defaulted on their payments to Agri Bank, Agri Bank should be allowed to commence foreclosure. However, with a

new automatic stay in place as a result of the Wald's third Chapter 12 being filed, Agri Bank believes court approval is now necessary to pursue its foreclosure remedies, the stipulated "drop dead" provision notwithstanding.

■ Stipulations such as the one to which Agri Bank and Walds are party, have long been entered into and enforced to settle section 362(d) relief from stay motions. Courts are loathe to release debtors from the burden of such agreements since "if [debtors] can remake the terms of their stipulations, especially default provisions, such agreements could fall into disfavor, significantly complicating the process of negotiating consensual plan provisions and confirmation proceedings." *In re Burrows*, 1995 WL 42398, at \*3 (Bankr.D.Idaho 1995).

Walds presently argue that the stipulation should be unenforceable in the context of this bankruptcy case. To support this proposition, they cite to a case in which the court stated that an agreement not to file bankruptcy is unenforceable because it violates public policy. *See In re Madison*, 184 B.R. 686, 690 (Bankr.E.D.Pa.1995). The Walds then leap to the conclusion that a stipulation lifting the stay as to one creditor should also be found unenforceable. The court regards this argument as spurious at best, especially in the light of the *Olsen* case, the controlling law in this jurisdiction. *See In re Olsen*, 861 F.2d 188 (8th Cir.1988).

■ In this circuit, a showing of special circumstances is required to relieve a party from such a stipulation. *In re Olsen*, 861 F.2d at 189. In *Olsen*, the court required these special circumstances to not have been originally contemplated by either party to the agreement and relief from the stipulation must operate to prevent manifest injustice. In that case, the court found such circumstances to exist when the debtors received half of their expected farm program payment due to a change in the government's program. The court contrasted such a situation with the debtors' situation in *In re Borchardt*. *Id.* at 190. Under the stipulation in

2. Bankruptcy No. 94–30257.

the *Borchardt* case, the debtors agreed to fully pay the bank's post-petition lien by December 1, 1984. *In re Borchardt,* 47 B.R. 879 (Bankr.D.Minn.1985). If they fail to do so, the stay would be lifted. When the debtors failed to make the required payment, the court strictly held them to the stipulation's terms stating that the stipulation's clear and unambiguous language provided that in the event of default, the bank was entitled to relief of the automatic stay without further litigation. *Id.* at 881. The court further stated that the debtors' failure to make the payment was a default clearly contemplated by the parties provided for in the provisions of the stipulation.

■ In the present case, Agri Bank and the Walds entered into a stipulation, the language of which is noted *supra.* From the tenor of their testimony, Walds apparently position their renewed Chapter 12 and projected farm/ranching operation as so different from what their experience was previously as to constitute "special circumstances" sufficient to relieve them from the effect of the stipulation. As will be later discussed, the court finds absolutely no special circumstances which would justify relief from the stipulation. Walds simply failed to make the payment just as the debtors in *Borchardt.* This was a possibility that both parties certainly considered. Accordingly, the stipulation's terms shall be fully enforced and the automatic stay shall be lifted as to Agri Bank.

### 3.

■ Agri Bank further argues, under § 362(d), that Walds' bad faith in filing this case is also demonstrated by their abject reorganization prospects. As the Code does not define the term "cause," the decision to lift the stay is committed to the discretion of the bankruptcy court. *In re C & S Grain Co., Inc.,* 47 F.3d 233 (7th Cir.1995); *Claughton v. Mixson,* 33 F.3d 4 (4th Cir.1994) (stating that because the Bankruptcy Code provides no definition of what constitutes "cause," the courts must determine when discretionary relief is appropriate on a case-by-case basis). It is a lack of good faith to refile in the face of, and as a means to avoid

the effects of a stipulation where there are no "special circumstances." The lack of good faith in filing a petition for bankruptcy has been recognized by many circuits as a basis for lifting the stay. *In re Laguna,* 30 F.3d 734, 737 (6th Cir.1994) (citing *In re Arnold,* 806 F.2d 937 (9th Cir.1986); *In re Little Creek Dev. Co.,* 779 F.2d 1068 (5th Cir.1986)); *see also In re Ashton* 63 B.R. 244, 247 (Bankr.D.N.D.1986) (stating that the element of bad faith may constitute "cause" under § 362(d)(1) and may be exemplified by the proposal of a flawed plan even though the plan itself has not come on for confirmation). While no single fact is dispositive of a debtor's lack of good faith, the following factors are meaningful in evaluating such assertions:

(1) the debtor has one asset;

(2) the pre-petition conduct of the debtor has been improper;

(3) there are only a few unsecured creditors;

(4) the debtor's property has been posted for foreclosure, and the debtor has been unsuccessful in defending against the foreclosure in state court;

(5) the debtor and one creditor have proceeded to a standstill in state court litigation, and the debtor has lost or has been required to post a bond which it cannot afford;

(6) the filing of the petition effectively allows the debtor to evade court orders;

(7) the debtor has no ongoing business or employees; and

(8) the lack of possibility of reorganization.

*In re Laguna,* 30 F.3d 734, 738 (6th Cir. 1994).

In the case at bar, Walds' lack of good faith is called into question by several of these factors. First, their prepetition conduct is at best troublesome. They have had the advantage of the automatic stay for the better part of almost four years yet still find themselves with financial difficulties. Secondly, all three petitions have been filed directly before a foreclosure sale of their property. The Walds even admit on page four of their Post Trial Brief Opposing Motion to Lift Stay, that they filed the case to prevent "the involuntary sales of assets." Additional-

ly, the filing of this petition effectively allows them to evade this Court's previous Order approving the stipulation allowing Agri Bank immediate relief from the automatic stay in the event of Walds' default.

Of the most telling factors, however, is their repeated inability to propose a feasible plan of reorganization—a deficit that has not been overcome. Evidence to be considered in assessing this factor is analogous to section 362(d)(2)'s requirement that the debtors establish that there is a "reasonable possibility of reorganization within a reasonable time." *Compare id.* (stating that "lack of a possibility of reorganization" may be indicative of a debtor's lack of good faith) *with In re Ziebarth,* 113 B.R. 591, 593–94 (Bankr. D.N.D.1990) (quoting *United Savings Assn. of Texas v. Timbers of Inwood Forest,* 484 U.S. 365, 373–75, 108 S.Ct. 626, 632, 98 L.Ed.2d 740 (1988) and stating that in proving that property is not necessary to an effective reorganization under section 362(d)(2), the debtors must establish "not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect*" and that this standard requires that there must be a "reasonable possibility of successful reorganization within a reasonable time."). This court cannot see a substantive difference between the analysis to establish the factor indicating lack of good faith, specifically, that Walds are unable to propose a possibility of reorganization, and the analysis necessary to establish there to be no reasonable possibility of reorganization within a reasonable time under 362(d)(2). It then follows that this court's cases establishing the latter could constitute "cause" under 362(d)(1) if such "cause" indicates to the court the debtor's bad faith.

### 4.

In their present and third Chapter 12 case, Walds' projections are based upon a diversified grain and cattle operation not substantially different than what it was in the two prior cases. They plan to grow wheat, corn and sunflowers and sell up to two hundred head of cattle each year. In addition, they intend to generate income collecting rent and selling used tires. A detailed look at their 1998 [3] income and expense projection reveals the following:

### Chapter 12   1998 Projection

**Annual Income**

| | |
|---|---|
| Grain Sales | $111,450 |
| FSA Payments | $ 6,000 |
| Livestock Sales | $ 78,000 |
| Miscellaneous (land rent, tire sales) | $ 64,600 |
| TOTAL INCOME: | $260,050 |

**Annual Expenses**

| | |
|---|---|
| Fuel | $ 5,450 |
| Seed | $ 7,470 |
| Fertilizer | $ 6,500 |
| Chemical | $ 7,500 |
| Utilities | $ 7,200 |
| Repairs | $ 12,000 |
| Insurance | $ 6,120 |
| Land Rent | $ 26,070 |
| Livestock Purchases | $ 18,000 |
| Feed | $ 10,000 |
| Real Estate Taxes | $ 6,000 |
| Vet Supplies | $ 3,000 |
| Vehicle payment | $ 4,200 |

**3.** The 1998 projection's income and expenses were used since the 1997 projection's income included carry-over grain sales from 1996.

|                        | TOTAL EXPENSES: | $119,510 |
| ---------------------- | --------------- | -------- |
| Family Living          |                 | $ 18,000 |
| **Net Available for Debt Service** |     | **$122,540** |

From the above figures, the Walds assert that there will be $122,540 available to service debt under their Chapter 12 plan which requires $95,158.16 annually to repay creditors.[4] In order to determine the accuracy of these projections, it is helpful to review the income and expense figures separately comparing them to historical financial data of the Walds' operation and the historical yields according to the "Farm Management Planning Guide: Projected 1997 Crop Budgets South Central North Dakota" authored by the North Dakota State University Extension Service.[5]

a. Projected Income

Walds project that the major source of income will be from grain sales. In both of their past bankruptcy cases, they projected $141,050 in crop sales for 1994 and $209,750 for both 1995 and 1996. Their actual performance, however, fell far short of their projections as they only realized $61,714 in 1994 and $61,830 in 1995, making the actual 43% and 29% of the respective projections. In each year, the Wald's attribute their inaccurate projections to a late, wet spring.

Mrs. Wald's in court testimony projected the 1997 and 1998 grain sales as follows:

| Crops      | Acres Planted | Yield (bu./acre)  | Price         | Income   |
| ---------- | ------------- | ----------------- | ------------- | -------- |
| Wheat      | 300           | 30                | $3.50         | $31,500  |
| Corn       | 200           | 75                | $2.25         | $33,750  |
| Sunflowers | 330           | 1400 (lbs./acre)  | $ .10 to .11  | $46,200  |

If these numbers are accurate, Walds should expect to realize $111,450 from grain sales. There is reason, however, to doubt the accuracy of Mrs. Wald's numbers. First, according to the historical county averages, the corn yield is 60 bu./acre–not 75 bu./acre. Also, the historical county average for sunflowers is 1246 lbs./acrenot the 1400 lbs./acre the Walds are projecting. Use of the proven historical yields reduces the Wald's grain income to $101,289.18.

In addition to not using the established historical yields compiled by NDSU, Mrs. Wald's in-court testimony contradicted her 2004 Examination testimony given on February 6, 1997. During the 2004 exam, she stated that her projections were based upon planting 330 acres of wheat, 200 acres of corn

and 350 acres of sunflowers all the while using what she successively stated were county averages—26 bushels for wheat, 65 bushels for corn and 1,400 pounds for sunflowers. On cross examination, Mrs. Wald admitted these were not county averages and that she was mistaken to have stated so in her 2004 exam. As one can see, comparison of Mrs. Wald's testimony given during the 2004 exam and her in-court testimony reveals both her inaccuracy and inconsistency, and, therefore, is unreliable. The Walds presented no evidence explaining why their heightened future yields would outperform NDSU's historical yield figures. As there is no objective base for Walds' data, the court must conclude that NDSU's yield figures are a much more reliable indicator of future yields.

---

4. Notably, the highest interest rate at which this plan proposes to repay its secured creditors, including both Agri Bank and SSB, is 8.5% which, from hearing testimony, does not constitute a "market rate." According to John Ust, senior credit officer with Agri Bank, a tier 3 loan rate of 11.45% would be the best rate the Walds would qualify for and is the market rate.

5. The Guide estimates crop prices for 1997. It also sets out historic average crop yields. This publication is widely relied upon by lenders and farmers/ranchers in establishing annual agricultural income/expense budgets. It also cautions that risk needs to be accounted for separately as it is not considered in the estimates.

Furthermore, the Debtors' projections do not account for the risk of a late, wet spring in 1997. Snowfall for this season is on the verge of a century mark. It would be remiss for this Court to ignore this fact or the imminence of a late, wet spring which is likely to occur in 1997 potentially worse than anything Walds have ever experienced in the past. It is further remiss of Walds to project, or the Court to accept, Walds' unsubstantiated 1997 grain income projection which is nearly twice as much as what actually occurred in 1994 and 1995 when late, wet spring weather caused grain income to average at $61,772.

Sadly, falling far from their projections is nothing new for the Walds. Historically, they have projected cattle sales between $309,600 to $312,806. However, actual cattle sales have been from 7% of their projection in 1996 to 19% of their projection in 1994. Such great inaccuracies cannot be ignored when assessing the credibility of Walds' current projections.

They project $78,000 in 1998 livestock sales, based upon Mrs. Wald's testimony that they would be selling 200 head of cattle weighing between 550–650 lbs. for $0.60/lb. However, to achieve their § 78,000 projection, all 200 cattle must weigh 650 lbs. If all the cattle weighed 550 lbs., livestock sales would bring in $66,000. That, however, is not the end of the problems with her livestock sales projection. Again, Mrs. Wald's in-court testimony contradicted her 2004 exam where she stated that they would be selling somewhere between 160 to 200 head all weighing 650 lbs. (See 2004 Examination of Debra S. Wald, p. 58–59.) Using the low range for both number of head and weight, livestock income could realistically be as low as $52,800 and still fall within the range to which Mrs. Wald testified. This is a far cry from the $78,000 listed as income on their 1998 projection. Moreover, the $78,000 is far in excess of the $58,411 actually realized from cattle sales in 1994 or the $50,188 actually realized in 1995.

### b. Projected Expenses

Walds project total farm expenses to be $122,510. Again, their expense projections fall short of reality, especially with respect to input costs associated with planting the crops which they now project to be $26,920. A detailed analysis of these costs reveal that Walds' inaccurately estimate these expenses and ignore past experience.

First, they project to spend $5,450 for fuel. No evidence was presented to support this amount. Estimates from NDSU state that fuel would cost $6.63 per acre for wheat, $8.48 per acres for corn and $4.30 per acre for sunflowers. These costs multiplied by the acreage planted for each crop (300 acres of wheat; 200 acres of corn; 330 acres of sunflowers) reveal that fuel costs are more likely to cost $5,104. According to the average of their 1992–1995 tax returns, the Walds' historical fuel expense has been $7,585. All of this leads the court to determine that the Debtors' projected fuel expense is both inaccurate if NDSU's numbers are used, and, more likely, underestimated if the Walds' historic fuel expense is used.

Their current projections also greatly underestimate the costs for seed, fertilizer and chemical. They project seed to cost $7,470. Here again the projections fall far short from NDSU's estimates. NDSU estimates seed to cost $8.00 per acre for wheat, $20.80 for corn, and $11.00 for sunflowers. This brings the seed expense up to $10,190. The Walds produced no evidence to show why NDSU's estimates would be inaccurate. In fact, their historical seed expense has been $10,257.

The Walds project their fertilizer expense to be $6,500. This, too, is an understatement. Historically, they have spent $10,614 on fertilizer annually. Furthermore, NDSU calculates fertilizer for wheat at $14.13 per acre, corn at $13.29 per acre and $9.68 for sunflowers, bringing the total fertilizer expense to $10,091.40. Not surprisingly, Walds' chemical expense was also understated according to NDSU's projected costs. As they only allotted for $7,500, NDSU's estimates would bring the chemical expense up to $12,768.60 by allotting $10.21 per acre for wheat, $21.60 per acre for corn and $16.32 for sunflowers.

■ Using NDSU's projections, the Walds' input expenses for 1998 and succeed-

ing years should be $38,154 rather than the $26,920 they allotted. Walds presented no evidence causing the court to regard any of their input costs to be a more accurate reflection of true input costs nor cause it to disregard NDSU's figures. As this court has stated so many times:

> A debtor should not premise future plan cash flows upon heightened yield or market data for successive plan years unless there is some objective base for such data. The plan must, to the extent possible, be based on known inputs including yields [and income] as presently existing. No one can predict what prices will be in the future and it is folly to peg feasibility upon future yields and market prices which are at best often unpredictable and at worst even imaginary.... [T]estimony should be based on historical production figures....

*In re Foertsch*, 167 B.R. 555, 567 (Bankr.D.N.D.1994)(quoting *In re Konzak*, 78 B.R. 990, 994 (Bankr.D.N.D.1987)).

With the foregoing standard in mind, this Court could not possibly accept the Walds' 1997 and 1998 projections as being credible as they are premised upon unsubstantiated yields. Nor can the Court disregard the Debtors' historical experience or the estimates compiled by NDSU and adopted by Mr. Ust, a highly qualified and credible witness possessed of a bachelor's degree in agricultural economics.

### c. Likely Income and Expenses

The sixth and most recent plan proposed by Walds requires $95,158.16 to fund annual plan payments.[6] This annual amount does not factor in a market rate of interest for either Agri Bank or SSB. *See In re Honeyman*, 201 B.R. 533, 535 (Bankr.D.N.D.1996). According to the evidence presented and giving Walds a now undeserved benefit of the doubt on most items, the court regards the following projections to be the "best-case" scenario:

**Annual Income**

| | |
|---|---|
| Grain Sales | $ 61,772 |
| FSA Payments | $ 6,000 |
| Livestock Sales | $ 78,000 |
| Miscellaneous (land rent, tire sales) | $ 64,600 |
| TOTAL INCOME: | $210,372 |

**Annual Expenses**

| | |
|---|---|
| Fuel | $ 5,450[7] |
| Seed | $ 10,190 |
| Fertilizer | $ 10,092 |
| Chemical | $ 12,769 |
| Utilities | $ 7,200 |
| Repairs | $ 12,000 |
| Insurance | $ 6,120 |
| Land Rent | $ 26,070 |
| Livestock Purchases | $ 18,000 |
| Feed | $ 10,000 |
| Real Estate Taxes | $ 6,000 |
| Vet Supplies | $ 3,000 |
| Vehicle payment | $ 4,200 |
| Custom hire | $ 3,925[8] |

6. The most recent plan incarnation is the Amended Plan filed on March 10, 1997. Previously Walds filed a plan in this case on January 8, 1997. In their 1993 case they filed a plan on August 27, 1993, followed by a modified plan on February 10, 1994. In the 1994 case a plan was filed on June 20, 1994, followed by a modified plan on September 14, 1994, which was confirmed.

7. The amount Walds projected is used even though historically fuel has cost $7,585.

8. The court includes this as it has historically been an expense and Walds gave no reason for its exclusion.

|  |  |
|---|---|
| TOTAL EXPENSES: | $134,016 |
| Family Living | $ 18,000 |
| **Net Available for Debt Service** | $ 58,356 |

It is apparent that $58,356 is insufficient to fund a plan which will require more than $95,158.16 to fund on an annual basis. Moreover, since 1992, Walds' only positive cash flow occurred in 1993 when they had $54,971 available to service debt which would also be insufficient to fund Walds' current plan. All the other years (*e.g.* 1992, 1994, 1995 and 1996), Walds have had a negative cash flow.

5.

As is evident from the foregoing, the Walds' expense projections are unrealistic and not reflective of what has occurred in the past nor what is likely to occur in the future. There are no special circumstances to account for this. Based upon the hearing testimony and income and expense data received into evidence, the court therefore finds NDSU's estimates and their historical experience to be a more accurate reflection of what Walds' true experience will likely be. These facts, coupled with their prepetition conduct, their admitted purpose for filing this petition which allows them to evade this Court's previous order and the fact that this is their third case and they have been given many opportunities to put together a plan to reorganize, lead the court to but one conclusion, that the instant Chapter 12 petition was filed in bad faith which constitutes cause under § 362(d)(1).

Accordingly, consistent with the terms of the stipulation and in the face of circumstances constituting bad faith, Agri Bank's motion under 11 U.S.C. § 362(d)(1) for relief from stay is GRANTED.

**SO ORDERED.**