**In re Glen A. TOFSRUD, Debtor.**

**Bankruptcy No. 98–31216.**

United States Bankruptcy Court,
D. North Dakota.

Feb. 17, 1999.

Wayne, Drewes, Fargo, North Dakota, Trustee.

David L. Johnson, Fargo, North Dakota, for debtor.

David T. DeMars, Fargo, North Dakota, for Ramsey National Bank.

### *MEMORANDUM & ORDER*

WILLIAM A. HILL, Bankruptcy Judge.

Debtor Glen Allen Tofsrud ("Tofsrud") filed his voluntary petition for relief under the provisions of Chapter 12 of the United States Bankruptcy Code ("Code") on July 15, 1998. Presently, he seeks confirmation of his Amended Chapter 12 Plan of Reorganization ("Amended Plan"), which he filed on Decem-

ber 14, 1998, and to which Ramsey National Bank and Trust Company ("Ramsey") interposed an objection on December 24, 1998. Ramsey objects to confirmation of the Amended Plan upon numerous bases, principal among them being that it lacks feasibility. In this respect, Ramsey argues that Tofsrud is incapable of making all of the payments provided for under the Amended Plan and of complying with it pursuant to 11 U.S.C. § 1225(a)(6). In particular, Ramsey argues that his projected income and expense data are unreasonably optimistic in that they are unsupported by his historical farming data or by comparable objective facts. Ramsey additionally filed an Amended Motion for Relief from Stay, as well as a Motion to Convert or Dismiss, on December 24, 1998. All of these matters came on for hearing before the undersigned on January 5 and 6, 1999 ("January hearing"), at which time they were taken under advisement. The following now constitutes this Court's determinations thereon:

## I. FACTS

### 1.

Tofsrud, age 57, has been a farmer since 1961. Presently, he operates farm, trucking, and cattle operations near Minnewauken, North Dakota. Tofsrud's friend Jane Brown; his son, Allen Tofsrud; and Allen's wife all assist Tofsrud in running the businesses, although for little or no compensation. In this respect, Tofsrud pays neither Jane Brown nor his daughter-in-law anything for their labor, and estimates that he pays his son $20,000.00 annually for his.

Tofsrud's farm operation is comprised both of land which he leases and land which he owns. Of his leased land, Tofsrud rents 1183 acres from a Ms. O'Connell, 932 acres from a Ms. Harper, and 304 acres from his son. Tofsrud is current on his lease obligations to O'Connell and Harper, but not on those to his son, to whom he is more than $7,000.00 in arrears. Parenthetically, his son's land is currently in foreclosure.

As to his own land, Tofsrud lists ownership, in his Amended Schedule A, of fee title to 1611 cropland acres in Benson County, in which Ramsey holds mortgages aggregating $331,860.14.[1] He also lists ownership of an unencumbered homestead in Benson County, which includes 50 cropland acres. Thus, from his Schedules and his testimony at the hearing, it appears that Tofsrud owns and leases a total of 4080 acres. Of this amount, he asserts that his cropland aggregates 3420 acres.

Prior to 1997, Tofsrud's crops included small grains, sunflowers, and edible beans. Yet, during the 1990s, the cost of their production began to outstrip the gross income they generated for him. Accordingly, in 1997, Tofsrud began searching for a crop with a better market, and eventually converted his acreage to alfalfa production. In conjunction therewith, he began a small trucking business to haul his alfalfa harvest to its various purchasers. For crop delivery, Tofsrud either charges a fee of between $1.10 and $1.12 per mile traveled or charges nothing at all beyond the crop price itself.

In addition to these activities, in which he is primarily engaged, Tofsrud also raises a small number of cattle. Tofsrud's Amended Schedule B lists the following animals as among his "Personal Property": 11 cow/calf pairs, 5 bred cows, 6 cows open, and one bull, in all of which Ramsey holds a lien aggregating $306,057.59.

### 2.

During much of the 1990s, and most especially in recent years, small grain and cattle prices have declined precipitously. As a result, many farmers engaged in one or the other have fallen on hard times of late. Tofsrud, being engaged in both, encountered significant financial difficulties in both his diversified grain and cattle operations contemporaneously. Further, his transition from diversified grains into alfalfa did not meet with initial success. In particular, Tofsrud's federal income tax returns over the past five years indicate that he suffered net farm losses of $53,765.00 in 1993 and

1. This acreage is comprised of three parcels of land described by Tofsrud in his Amended Schedule A as being, separately, 295 cropland acres, 381 cropland acres, and 935 cropland acres located in Benson County.

$6,083.00 in 1994, and net farm profit of only $4,838.00 in 1995 and $4,773.00 in 1996. Worse yet, he suffered a net farm loss of $121,484.00 in 1997, the first year in which he began producing alfalfa and trucking that product to its purchasers. Thus, in 1998, his sustained losses and marginal profits led him to attempt to reorganize his businesses under the shelter of the Code.

Tofsrud filed his Chapter 12 bankruptcy petition on July 15, 1998, and his Schedules on July 29, 1998. On August 27, 1998, Ramsey filed a proof of claim against Tofsrud in the amount of $651,155.01, secured in its entirety by Tofsrud's real property, motor vehicles, farm machinery and equipment, and crops, which Ramsey valued at $700,000.00 in toto. Thereafter, on October 13, 1998, Tofsrud filed his first Chapter 12 Plan of Reorganization. On December 14, 1998, he filed his Amended Plan, and his Amended Schedules on January 4, 1999.

In his Amended Schedules, Tofsrud lists Ramsey as holding four secured claims: a claim in the amount of $48,932.81 secured by a mortgage in 295 cropland acres located in Benson County; a claim of $224,580.00 secured by a mortgage in 935 cropland acres in Benson County; a claim of $58,347.33 secured by a mortgage in 381 cropland acres in Benson County; and a claim of $306,057.59 secured by a lien on his 1997 alfalfa crop, and on his equipment and livestock. Tofsrud treats Ramsey's claims as impaired in Classes 2 through 5 of the Amended Plan.

Class 2 treats Ramsey's claim which is secured by 295 cropland acres in Benson County, and which, on the petition date, amounted to $56,667.49. Class 3 treats Ramsey's claim which is secured by 935 cropland acres in Benson County and which amounted to $236,574.84 on the petition date. Class 4 treats Ramsey's claim which is secured by 381 cropland acres and which amounted to $61,773.01 on the petition date. Finally, Class 5 treats Ramsey's claim which is secured by, inter alia, Tofsrud's 1997 alfalfa crop, and his equipment and livestock, and which amounted to $306,057.59 on the petition date.

Classes 2 through 4 share many common characteristics. First, pursuant to each class, Ramsey shall retain its prepetition mortgage in the real estate. Second, all payments on the claims shall be made outside of the Amended Plan. Third, all claims are calculated as of November 1, 1998, and are reamortized for payment as follows:

Interest shall accrue on the reamortized indebtedness at a variable rate of 2% over Wall Street Prime—Midwest Edition. On March 1, 1999, [Tofsrud shall make an initial payment to Ramsey under the claim in each class ("First Payment").] Thereafter, annual payments shall be made for the same on March 1 of each year, commencing on March 1, 2000, and shall continue through March 1, 2009, when the indebtedness shall balloon and all remaining principal and accrued interest will be due and payable in full. The March 1, 2000, payment and all subsequent payments, with the exception of the March 1, 2009 balloon payment, shall be in an amount sufficient to cover a partial repayment of principal based on a twenty-year amortization schedule, together with accrued interest. The payments will be calculated on an equal payment basis varying only as a consequence of changes in the interest rate. [The annual payment for the various debt figures is calculated with an interest rate of 9.75%, that being the current rate.]

Under these conditions, the amount of the claim under Class 2 is calculated to be $60,855.21 as of November 1, 1998, the First Payment therefor shall be in the amount of $2,806.41, and the annual payment thereafter shall be in the sum of $6,928.00; the amount of the claim under Class 3 is calculated to be $244,696.24, the First Payment shall be $8,539.93, and the annual payment shall be $28,174.68; and lastly, under Class 4 the amount of the claim is $64,065.01, the First Payment shall be $2,618.60, and the annual payment shall be $7,332.35. As to Claim 5, the Amended Plan provides as follows:

1. [Ramsey] shall retain its prepetition lien.

2. The 1997 alfalfa, having an estimated value of $60,000.00, will be surrendered to [Ramsey].

3. [Tofsrud] shall sell 11 steers and remit the net sale proceeds to [Ramsey].

4. [Ramsey's] remaining secured claim, for purposes of payout under the Plan, will be adjusted to an amount equal to the remaining value of the livestock and the equipment, or the remaining debt (whichever is less) calculated to be $252,000.00, and shall be reamortized for payment as follows: Interest will accrue on the reamortized obligation at a variable rate of 2% over Wall Street Prime—Midwest Edition. On March 1, 1999, [Tofsrud] shall pay $10,077.81 to [Ramsey]. Thereafter, [he] will make annual payments on March 1 of each year commencing March 1, 1999, and continuing through March 1, 2004, when all remaining principal and accrued interest will be due and payable in full. The March 1, 2000 payment and all subsequent payments shall be in an amount sufficient to cover partial payment of principal based on a seven (7) year amortization schedule, together with accrued interest. The payments will be calculated on an equal payment basis varying only as a consequence of changes in the interest rate. Based on a debt figure of $250,000.00 and an interest rate of 9.75% (this is the current rate), the annual payment will be $51,337.44.

5. **All payments shall be made outside of the Plan.**

(Emphasis in the original).

### 3. Plan Payments

Under the Amended Plan, Tofsrud pledges to make the following plan payments:

| CREDITOR | AMOUNT 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|
| Benson Cnty. Treas. | $ 760.96 | $ 2,164.50 | $ 2,164.50 | $ 2,164.50 | $ 2,164.50 |
| Jane Brown | $ 3,560.00 | $ 7,215.00 | $ 7,215.00 | $ 7,215.00 | $ 7,215.00 |
| Ramsey | $ 2,806.41 | $ 6,928.90 | $ 6,928.90 | $ 6,928.00 | $ 6,928.00 |
| Ramsey | $ 8,539.93 | $ 28,174.68 | $ 28,174.68 | $ 28,174.68 | $ 28,174.68 |
| Ramsey | $ 2,618.60 | $ 7,332.35 | $ 7,332.35 | $ 7,332.35 | $ 7,332.35 |
| Ramsey | $10,077.81 | $ 51,337.44 | $ 51,337.44 | $ 51,337.44 | $ 51,337.44 |
| Unsecured Creds. | $ Unknown | $ Unknown | $ Unknown | $ Unknown | $ Unknown |
| **TOTAL** | **$28,363.71** | **$103,152.87** | **$103,152.87** | **$103,152.87** | **$103,152.87** |

Of most immediate concern, Tofsrud's 1999 plan payments come due in March of this year. However, Tofsrud asserts that his Amended Plan will provide him with sufficient net income to meet his obligations in each year of the plan.

### 4. Plan Projections

Under his Amended Plan, Tofsrud projects farm income and expenses from 1998 through 2002. In 1998, he projected total gross income of $253,300.00 from five sources. First, he anticipated gross alfalfa income of $180,-000.00. Second, he expected gross livestock income of $3,300.00. Third, he anticipated receiving $30,000.00 in gross trucking income, related to the delivery of 1998 alfalfa. In this respect, he expected to drive 26,786 miles at a charge of $1.12 per mile. Fourth, he projected receiving a CCC payment of $15,000.00. Finally, he expected to receive an FCIC insurance payment of $25,000.00 related to 900 acres of his land.

He projected his 1998 expenses for the year to aggregate $182,375.00, as follows:

| | |
|---|---|
| Fuel, seed, feed, fertilizer, and chemicals: | $ 8,000.00 |
| Equipment rental: | $28,000.00 |
| Utilities: | $ 6,000.00 |
| Machinery repairs: | $ 3,000.00 |
| Federal crop insurance: | $ 5,000.00 |
| Property, health, and other insurance: | $ 4,000.00 |

| | |
|---|---|
| Real estate taxes: | $ 5,500.00 |
| Cash rent of farmland: | $54,000.00 |
| Hired labor (Allen Tofsrud): | $20,000.00 |
| Truck lease: | $18,000.00 |
| Livestock feed expense: | $ 6,000.00 |
| Livestock veterinarian expense: | $ 500.00 |
| Miscellaneous: | $ 3,000.00 |
| Family living expense: | $12,000.00 |
| Trucking expense: | $ 9,375.00 |

Accordingly, Tofsrud expected to derive net income of $70,925.00 for 1998.

In 1999 and 2000, Tofsrud projects the following income and expenses:

### 1999 & 2000 INCOME PROJECTIONS

| Source | Yield | Acres | Total Yield | Price | 1999 | 2000 |
|---|---|---|---|---|---|---|
| Alfalfa | 2.5 ton | 2500 | 6250 tons | $45/ton | $281,250.00 | $281,250.00 |
| Livestock | 15 steers | | 500 lbs | $60/cwt | $ 4,500.00 | $ 4,500.00 |
| Trucking | | | 80,000 miles | $1.12/mile | $ 89,600.00 | |
| Trucking | | | 95,000 miles | $1.12/mile | | $106,400.00 |
| CCC | | | | | $ 12,000.00 | $ 12,000.00 |
| FCIC | | 400 | | | $ 8,880.00 | $ 8,880.00 |
| Sunflowers | 1000 lb | 500 | 500,000 lb | $ .08 | $ 40,000.00 | |
| Barley | 40 bushels | 500 | 20,000 bu | $1.50 | | $ 30,000.00 |
| GROSS INCOME: | | | | | $436,230.00 | $443,030.00 |

### 1999 & 2000 EXPENSE PROJECTIONS

| | 1999 | 2000 |
|---|---|---|
| Fuel, seed, feed, fertilizer, and chemicals: | $ 21,000.00 | $ 19,000.00 |
| Equipment rental: | $ 30,000.00 | $ 30,000.00 |
| Utilities: | $ 6,000.00 | $ 6,000.00 |
| Machinery repairs: | $ 6,500.00 | $ 6,500.00 |
| Federal crop insurance: | $ 5,000.00 | $ 5,000.00 |
| Property, health, and other insurance: | $ 4,000.00 | $ 4,000.00 |
| Real estate taxes: | $ 5,500.00 | $ 5,500.00 |
| Cash rent of farmland: | $ 54,000.00 | $ 54,000.00 |
| Hired labor (Allen Tofsrud): | $ 20,000.00 | $ 20,000.00 |
| Truck lease: | $ 18,000.00 | $-0- |
| Livestock feed expense: | $ 6,000.00 | $ 6,000.00 |
| Livestock veterinarian expense: | $ 500.00 | $ 500.00 |
| Miscellaneous: | $ 3,000.00 | $ 3,000.00 |
| Family living expense: | $ 12,000.00 | $ 12,000.00 |
| Trucking expense: | $ 28,000.00 | $ 33,250.00 |
| Twine: | $ 7,800.00 | $ 7,800.00 |
| Harvest Expense (500 × 10.00): | | $ 5,000.00 |
| TOTAL EXPENSES | $233,300.00 | $217,550.00 |

Under these figures, Tofsrud anticipates receiving net income of $202,930.00 in 1999 and $225,480.00 in 2000. For the years 2001 and 2002, he makes the following projections:

| Source | Yield | Acres | Total Yield | Price | 2001 | 2002 |
|---|---|---|---|---|---|---|
| Alfalfa | 2.5 ton | 2500 | 7250 tons | $45/ton | $326,250.00 | $326,250.00 |
| Livestock | 15 steers | | 500 lbs | $60/cwt | $ 4,500.00 | $ 4,500.00 |
| Trucking | | | 95,000 miles | $1.12/mile | $106,400.00 | $106,400.00 |
| CCC | | | | | $ 12,000.00 | $ 12,000.00 |
| FCIC | | 300 | | | $ 7,480.00 | $ 7,480.00 |
| Oats | 50 bushel | 200 | 10,000 lb | $ .90 | $ 9,000.00 | |
| Barley | 40 bushel | 200 | 8,000 bu | $1.50 | | $ 12,000.00 |
| GROSS INCOME: | | | | | $465,630.00 | $468,630.00 |

### EXPENSES

| | 2001 | 2002 |
|---|---|---|
| Fuel, seed, feed, fertilizer, and chemicals: | $ 25,000.00 | $ 18,200.00 |
| Equipment rental: | $ 30,000.00 | $ 30,000.00 |
| Utilities: | $ 6,000.00 | $ 6,000.00 |
| Machinery repairs: | $ 6,500.00 | $ 6,500.00 |
| Federal crop insurance: | $ 5,000.00 | $ 5,000.00 |
| Property, health, and other insurance: | $ 4,000.00 | $ 4,000.00 |
| Real estate taxes: | $ 5,500.00 | $ 5,500.00 |
| Cash rent of farmland: | $ 54,000.00 | $ 54,000.00 |
| Hired labor (Allen Tofsrud): | $ 20,000.00 | $ 20,000.00 |
| Truck lease: | $–0– | $–0– |
| Livestock feed expense: | $ 6,000.00 | $ 6,000.00 |
| Livestock veterinarian expense: | $ 500.00 | $ 500.00 |
| Miscellaneous: | $ 3,000.00 | $ 3,000.00 |
| Family living expense: | $ 12,000.00 | $ 12,000.00 |
| Trucking expense: | $ 33,250.00 | $ 48,250.00 |
| Twine: | $ 9,000.00 | $ 9,000.00 |
| Harvest Expense (500 × 10.00): | $ 2,000.00 | $ 2,000.00 |
| TOTAL EXPENSES | $221,750.00 | $229,950.00 |

Thus, Tofsrud expects to derive net income of $243,880.00 in 2001 and $238,680.00 in 2002.

Ramsey challenges Tofsrud's projections by contending that they are unreasonably optimistic in that they are unsupported by his historical farming data or by any comparable objective facts. Thus, Ramsey asserts that Tofsrud's Amended Plan is unfeasible and should be denied confirmation. For purposes of comparison and evaluation, the Court has before it Tofsrud's actual performance figures for 1997 and 1998, as well as comprehensive agricultural data compiled by North Dakota State University ("NDSU") for the land region encompassing his farmland.

### 5. Actual Performance

#### i. 1997

In 1997, Tofsrud switched his crop production to alfalfa, a crop which he had never before grown. At the January hearing, he described the many advantages of alfalfa production, as follows: it is a perennial grass, and thus does not require annual seeding; it builds soil, adding nitrogen thereto; it aids in weed control; it has deep roots and prevents soil erosion from both wind and water; and, once established, it may be harvested as many as three times in a year. He also described several disadvantages associated with alfalfa production, to wit: it is susceptible to being "drowned out" by overly wet soil conditions; it requires a year's time in which to "establish" itself—that is, to grow independent of seeding by a farmer and to deliver a full yield; and it is a specialty crop

which thus requires, for sale, a negotiated contract with a third party—in other words, a farmer cannot simply drive up to a farm elevator to sell it, as he or she can with some other crops.

In his first year of alfalfa production, Tofsrud experienced all of the above-described difficulties to varying degrees. First, 1000 acres of his land were "wet" in 1997—too wet, in fact, to plant.[2] Moreover, and in this respect, Tofsrud further testified that 1000 acres of his land had been too wet to plant for *several preceding years.*

Second, his 1997 alfalfa yield was reduced because he was able to take only one crop cutting, as opposed to two or three. However, the precise yield from Tofsrud's 1997 alfalfa harvest is not amenable to discovery. Although Tofsrud, at one point during the January hearing, testified that his 1997 yield amounted to 3000 bales of alfalfa, he also stated during the hearing that he did not know the yield quantity of the 1997 alfalfa harvest.

Further, the quality of the 1997 harvest is in doubt. At one point, Tofsrud effectively testified that harvested both low and high grade alfalfa for the year.[3] Trent Tarvestad ("Tarvestad"), Senior Vice-president of Ramsey, characterized what he saw of the crop differently.

Tarvestad has worked with Tofsrud, in a lending capacity with Ramsey, since 1989. Tarvestad himself grew up on a farm, received a degree in agricultural economics from NDSU in 1977, and has worked in the area of agricultural lending since May of that year. He personally inspected Tofsrud's remaining 1997 alfalfa and characterized it as "very poor condition hay."

Third, Tofsrud was unable to sell much or most of the alfalfa harvested in 1997. Once again, his testimony proved imprecise: at one point during the January hearing, he estimated that he sold approximately $17,000.00 to $19,000.00 of the alfalfa to neigh-

boring farmers in 1997, and at yet another point he stated that he sold very little of the 1997 alfalfa. Further, it appears that there are no buyers for the remaining 1997 alfalfa.

In all, Tofsrud testified that his 1997 gross income aggregated $175,000.00, and was derived from government payments (CCC and FCIC) and from the sale of alfalfa and small grains.[4] For the year, he suffered a net farm loss of $121,484.00.

### ii. 1998

At the January hearing, Tofsrud testified that 1998 was the first year in which he engaged in large-scale commercial trucking. Further, he variously testified that he harvested 4000 tons of alfalfa in 1998 and, contrarily, that he sharecropped his 1998 alfalfa harvest and had no accounting—and no idea—of its yield. In this latter respect, he detailed his sharecropping agreements with Matt Schilling, Butch Shirpping, Albert Gross, Shorty Hagar, and Dwayne Ihry as follows:

1. Schilling took one cutting on at least 295 acres of alfalfa and stacked the harvested crop, receiving one-third of the harvest in return. As of the hearing, Tofsrud had no idea how much that harvest yielded; what Schilling's share thereof amounted to; how much alfalfa Schilling had removed from the fields; how much alfalfa, if any, in the fields remained due to Schilling; or how much alfalfa remained available thereon for sale by Tofsrud.

2. Shirpping entered into a similar arrangement on five quarters of land, taking one cutting for a one-third share thereon. Tofsrud stated that Shirpping commenced taking a second cutting but ceased midway and left the alfalfa in the fields to deteriorate. Tofsrud had *no* knowledge of how much alfalfa Shirpping harvested, removed, left standing, or left to Tofsrud from his activities on the five quarters of land.

---

2. Tofsrud does not specify whether the "wet" land is that which he owns or leases, or whether it is a combination of both.

3. He testified that he sold low grade alfalfa for $45 per ton and high grade alfalfa for $65 per ton. Yet, he also stated, without reference to the quality, that he sold alfalfa for $25 per bale.

4. Notably, no testimony was elicited on the question of Tofsrud's 1997 gross or net trucking- or livestock-related income, if any he derived.

3. Gross took a second cutting on 250 acres for one-half of the harvest therefrom. Tofsrud, again, has no idea how much alfalfa Gross cut, removed, left standing or left to Tofsrud.

4. Hagar took a cutting on 200 acres, receiving one-third of the harvest for his efforts. Tofsrud guesses that Hagar took his one-third share but doesn't know the amount of the harvest, what is left of it, or what remains for him to sell.

5. Ihry took first and second cuttings of alfalfa for an undisclosed share of the harvests.

In all, Tofsrud "guessed" that he received a yield of two tons of alfalfa per acre, on two cuttings, in 1998. He stated that until the alfalfa was weighed, his yield per acre could not be determined. However, as he already admitted that at least some of the alfalfa had been removed by the sharecroppers, he acknowledged that his total yield and yield-per-acre figures for 1998 are insusceptible to exact calculation.

He then conceded that his aggregate 1998 alfalfa sales, through November 1998, amounted to just over $15,000.00. As to those which he completed in December 1998, Tofsrud, after much questioning, long delay, and considerable evasiveness on the stand, eventually stated that he realized sales of $19,725.73 for that month, which amount, he stated, also included any trucking income derived therefrom. Subsequently, he stated that he derived 1998 gross income of $34,-500.00 from alfalfa sales, $4,500.00 from cattle sales, and $47,000.00 from trucking.[5] Additionally, he reported FCIC income of $29,000.00 for the year. However, as of the January hearing, he had not received his anticipated 1998 CCC payment, and was uncertain when, and in what amount, the payment would arrive.

When questioned about his expenses in December, Tofsrud failed to provide an answer. He did, however, testify that he exceeded his projected expenses for the *entire year* by $4,000.00, thus placing his aggregate 1998 expenses at $186,375.00, rather than at the $182,375.00 projected. Moreover, he testified that he has likely incurred some income tax liability in 1998, although he did not know, and could not estimate, in what amount. Tofsrud's 1998 expenses do not provide for such expense, and thus, it must be added to the $186,375.00 in expenses he incurred in 1998. Further, Tofsrud also testified that his expense projections do not provide for his truck insurance.

At the January hearing, Tofsrud testified that he operates his businesses on a cash basis. Accordingly, Tofsrud's 1998 gross income amounted to just under $116,000.00, far short—and, indeed, less than half—of his $253,300.00 projection. Significantly, even if Tofsrud had received his projected 1998 CCC payment of $15,000.00 in the 1998 calendar year, he still would have fallen short of his 1998 gross income projection by nearly half. As his 1998 gross expenses aggregated at least $186,375.00, Tofsrud suffered a net loss of more than $70,000.00 for the year.[6]

### 6. Future Performance

Numerous factors countervail and undermine Tofsrud's 1999 through 2002 projections, in whole or in part, as contained in NDSU agricultural statistics and Tofsrud's own testimony.

#### i. NDSU Data

Current NDSU agricultural statistics and crop-related projections for the land region in which Tofsrud farms are compiled in its publication, "Projected 1999 Crop Budgets [for] North Central North Dakota" ("NDSU projections"). The NDSU projections are

---

**5.** He estimated that his trucking expenses, for normal upkeep and fuel, as well as his hired labor expense related to driving—which appears to have been carried out by his son—amounts to $0.35 per mile.

**6.** Despite Tofsrud's statements that he has no knowledge of the amount of alfalfa remaining in his fields, he also testified that as of the January hearing he had 4000 tons of 1998 alfalfa remaining on hand, stored on the land where it was grown, and amounting to $100,000.00 in crop inventory. He further asserted that this crop inventory constitutes his "best hay." Yet he offered *no support whatsoever* for any of these assertions. Further, Tofsrud testified that he has no written contracts of any kind, and has not received a single downpayment on any verbal agreement which he claims to have made, for the sale of the 1998 harvest.

based upon average yields across the Central North Dakota region for the eight-year period of 1990 to 1997.

In particular, the NDSU figures provide only for a yield of 1.6 tons per acre of alfalfa in 1999, as opposed to Tofsrud's projections of 2.5 tons per acre in 1999 and beyond. Overall, the statistics, as applied to the acreages Tofsrud variously anticipates planting with alfalfa, sunflowers, barley and new alfalfa—and when added to Tofsrud's own figures for anticipated CCC and FCIC payments and livestock income—indicate that Tofsrud can expect aggregate gross income of $298,390.00 in 1999, as opposed to his own projection of $346,630.00 for the year [7]; and $314,250.00 in 2000, as contrasted with his projection therefor of $336,630.00.[8] Further, they indicate that Tofsrud can expect aggregate 1999 expenses of $332,525.00, as opposed to his projection of $205,300.00 [9]; and aggregate 2000 expenses of $351,227.00, as opposed to his projection of $184,300.00.[10] In sum, the statistics as applied to Tofsrud's farming operation, along with his figures for CCC and FCIC payments and livestock income, indicate that he will be operating his farming and cattle businesses at net losses of $35,135.00 in 1999, and $36,977.00 in 2000. These projections do not account for any net trucking income or losses which Tofsrud might derive or sustain during those two years.

### ii. Tofsrud's Testimony

Tofsrud's own testimony undermined his plan projections in six areas, to wit, those of his CCC payments, accommodation of crop "establishment," his future reliance upon farming his son's land, underinsurance of his equipment and livestock, the unprofitability of his livestock operation, and his history of poor performance in growing sunflowers.

First, Tofsrud's projections for 1999 through 2002 provide for CCC payments of $8,800.00 in 1999 and 2000, and $7,480.00 in 2001 and 2002. Yet, he stated that these figures are only estimates or guesses, as he has no idea what he will actually receive in payment under the program over this time period. The only certainty Tofsrud has as to the CCC payments is that they will decrease progressively over the four years, as the program is being phased out.

Second, Tofsrud has failed to adjust his projected harvest figures for alfalfa "establishment," that is, as previously described, for that period of time in which is required for the crop to grow independent of seeding, and in which the crop fails to produce good quality, or much, alfalfa. Moreover, it appears that he has failed to adjust his projected harvest figures with regard to "establishment" in two respects, first, with regard to the 1000 "wet" acres, and second, with regard to the 400 acres he intends to newly seed with alfalfa in 2001 and 2002. At the January hearing, Tofsrud did not address the former, but conceded with regard to the latter that his projections in 2001 and 2002 are not adjusted for, and do not accommodate, any "establishment" period for the newly-planted alfalfa acreage.

Third, each of Tofsrud's 1999 through 2002 total income projections includes income derived from crops grown on his son's land. Yet, Tofsrud acknowledged that the land is currently in foreclosure. Although he believes that his son's land will be available to him to lease throughout the duration of the Amended Plan, he also repeatedly refused to answer questions on cross-examination as to the basis for his belief that the land would continue to be available to him and, further,

---

7. The Court arrives at this figure by subtracting Tofsrud's projected gross trucking income of $89,600.00 from his projected aggregate income of $436,230.00 for the year.

8. The Court arrives at this figure by subtracting Tofsrud's projected gross trucking income of $106,400.00 from his projected aggregate income of $443,030.00 for the year.

9. The Court arrives at this figure by subtracting Tofsrud's projected trucking expense of $28,000.00 from his projected aggregate expenses of

$233,300.00 for the year. Of course, Tofsrud's actual trucking expense would be higher, owing to the truck insurance expense which he stated he did not include in his trucking expense figure in his projections.

10. The Court arrives at this figure by subtracting Tofsrud's projected trucking expense of $33,250.00 from his projected aggregate expenses of $217,550.00 for the year. Once again, Tofsrud's actual trucking expense would be higher, owing to the truck insurance expense.

denied any knowledge of the same. Yet, on redirect, he became very forthcoming in details and specifics for the same. At that point, with his prior noticeable memory lapse apparently behind him, Tofsrud stated, inter alia, that his son's mother would help their son repurchase the land and that she had told Tofsrud that he could continue farming on it. Tofsrud provided no support for any of these assertions, however.

Fourth, Tofsrud conceded that his equipment and livestock are currently underinsured by $9,000.00, and that in 1998 he only insured his alfalfa harvest in the amount of 500 tons, just a portion of the harvest he anticipated. In this respect, he stated that he has not been able to find an insurance company that is willing to insure his crop.

Fifth, Tofsrud stated that he expends $6,500.00 annually on his livestock operation, which leaves him with an annual operating loss therefor of up to $3,200.00. Although he expects this situation to continue under the Amended Plan, he refuses to alter or divest himself of this unprofitable business. At the January hearing, he had only this to say by way of explanation for his recalcitrance in keeping an unprofitable business enterprise while at the same time attempting to reorganize in bankruptcy: "I always felt it was a good thing on a farm to maintain ... [It] takes very little time...."

Also on the subject of his cattle business, Tofsrud admitted that he sold five heifers without Ramsey's permission and that he had failed to turn over a proceeds check in the amount of $1,500.00 and on which Ramsey is named to Ramsey. He also stated that although he made projections for steer income under his Amended Plan, he had no idea what he actually will actually receive in income therefor.

Sixth, Tofsrud acknowledged that although he has raised sunflowers within the last eight to ten years, the last time he raised them he did so only on 400 or 500 acres and had a bad yield for which he collected crop insurance.

## II. DISCUSSION

█ It is the debtor's burden to establish all of the elements essential to the confirmation of a plan, including its feasibility. *See Ames v. Sundance State Bank (In re Ames),* 973 F.2d 849, 851 (10th Cir.1992), *cert. denied,* 507 U.S. 912, 113 S.Ct. 1261, 122 L.Ed.2d 658 (1993). The feasibility requirement pertains to all proposed Chapter 12 plans pursuant to Code § 1225(a)(6), which mandates plan confirmation if "the debtor will be able to make all payments under the plan and to comply with the plan." 11 U.S.C. § 1225(a)(6); *see Abele v. Webb (In re Webb),* 932 F.2d 155, 157 n. 3 (2d Cir.1991); *In re Kuether,* 158 B.R. 151, 153 (Bankr.D.N.D. 1993). While it is not required that a debtor guarantee his plan, "[he] must provide 'reasonable assurance that the plan can be effectuated.'" *In re Ames,* 973 F.2d at 851 (quoting *First Nat'l Bank v. Hopwood (In re Hopwood),* 124 B.R. 82, 86 (E.D.Mo.1991).) He must, accordingly, prove that his proposed plan is "both realistic and will cash flow." *In re Kuether,* 158 B.R. at 153; *see In re Dittmer,* 82 B.R. 1019, 1022 (Bankr. D.N.D.1988).

█ In this respect, the Court must scrutinize the terms of the plan, and whether, in light of the debtor's projected income and expenses, the debtor is likely to meet his obligations thereunder. *See Prudential Ins. Co. v. Monnier (In re Monnier),* 755 F.2d 1336, 1341 (8th Cir.1985); *In re Honeyman,* 201 B.R. 533, 537 (Bankr.D.N.D.1996); *In re Foertsch,* 167 B.R. 555, 565 (Bankr.D.N.D. 1994); *see also Clarkson v. Cooke Sales & Serv. Co. (In re Clarkson),* 767 F.2d 417, 420 (8th Cir.1985); *In re Harper,* 157 B.R. 858, 866 (Bankr.E.D.Ark.1993). Moreover, the Court must be persuaded of the ability of the plan to cash flow "based upon realistic and objective facts (as opposed to visionary or overly optimistic projections)." *In re Honeyman,* 201 B.R. at 537; *see also In re Ames,* 973 F.2d at 851 (quoting *In re Novak,* 102 B.R. 22, 24 (Bankr.E.D.N.Y.1989)) ("A plan's 'income projections must be based on concrete evidence and must not be speculative or conjectural.'"); *In re Clarkson,* 767 F.2d at 420 ("the feasibility test is firmly rooted in predictions based on objective fact."). Although it is this Court's practice to grant debtors the every reasonable benefit of the doubt in matters concerning plan feasibility

in furtherance of the rehabilitative policies underlying the Code, *see, e.g. In re Foertsch,* 167 B.R. at 566; *In re Konzak,* 78 B.R. 990, 994 (Bankr.D.N.D.1987), the Court will not blindly confirm a plan which will not cash flow, and which is, therefore, unfeasible, *see In re Dittmer,* 82 B.R. at 1022.

■ After a review of all of the evidence presented in this matter, the Court can only conclude that Tofsrud's Amended Plan does not cash flow, is not feasible, and is incapable of achieving confirmation. In this connection, Tofsrud's actual performance figures and the NDSU-based calculations undo him.

First, Tofsrud has bet the farm, literally, on *profitably* growing, selling, and trucking alfalfa, a crop with which he has no prior demonstrated experience. Yet, in the only two years in which he actually grew alfalfa, Tofsrud did not turn even a small profit, but did, rather, suffer considerable losses. Nothing in the record suggests that he will achieve a different experience in the future.

Tofsrud, through his testimony, proved himself to be an incredibly unfortunate farmer. He has not been able to plant 1000 acres of his land for years now due to its overly wet condition. Although he hopes the land will dry out in the future, and under those years of his Amended Plan, given the vagaries of North Dakota weather of late, he is as likely to see the land continue in its wet state as he is to see it dry. Moreover, on the dry land on which he has grown alfalfa, he has traded a considerable percentage of his harvest away to sharecroppers. Under such circumstances in 1998, he failed in every respect to supervise these arrangements. He did not monitor what amount of alfalfa the sharecroppers removed from his land, nor does he now know what amount of alfalfa, if any, he continues to owe them for their labor. Instead, Tofsrud busied himself with attempts to garner sales agreements, and did not even take the time to inspect his lands and the alfalfa remaining thereon. In effect, then, Tofsrud attempted to sell as much alfalfa as he could, without knowing how much alfalfa he had to sell.

Although the burden of achieving plan confirmation is his, Tofsrud has done nothing to explain away his net farm losses of $121,-484.00 in 1997, and at least $70,000.00 in 1998, or to convince this Court that he will effect such a remarkable transformation in his agricultural businesses as to turn a sufficient profit in any year of the plan so as to meet his payment obligations thereunder. It is telling that he performed much more poorly in both his alfalfa and trucking businesses than he did without, when growing small grains. In the four years prior to 1997, the year in which he commenced alfalfa production, Tofsrud suffered two farm losses which together amounted to less than either of those he suffered in 1997 or 1998. Moreover, he actually turned a small net profit in each of 1995 and 1996, although, admittedly, a profit which now would be too small to service any of his current annual plan payment obligations.

Second, the Court must accept the NDSU figures, and the calculations based thereon, as more accurate indicators of Tofsrud's likely future performance under the Amended Plan than his own projections therefor. Tofsrud's testimony at the January hearing proved to be internally inconsistent and unreliable from start to finish. Moreover, as this Court has previously had occasion to comment, the NDSU statistics are often a farmer's best indicator of future yields and income, absent—and often even in light of—his or her own actual performance figures. In effect, when raised in objection to projected crop yield figures where, as here, the farmer has little or no experience growing the crop in question, the data often become a hurdle which the farmer must overcome in order to convince this Court of his or her crop yield and income projections.

The NDSU figures indicate that Tofsrud will suffer losses in his agricultural business in both 1999 and 2000. Under these figures, and even assuming the impossible—that is, that Tofsrud will be able to realize net trucking income of $73,150.00 as he projected for 2000, and leaving aside the issue of the additional expense of truck insurance—he would then, nonetheless, generate only $36,173.00 in net income out of which to meet $103,152.87 in plan payments. Yet the Court has serious doubts concerning Tofsrud's trucking figures.

Tofsrud's trucking income projections appear, particularly, to be based more upon wishful thinking than upon reality. He has no experience in trucking and thus cannot accurately predict his income therefrom. Moreover, his trucking income is *entirely dependent* on his ability to make alfalfa sales, something which was sorely lacking in both 1997 and 1998, the only two years in which he actually grew the crop. Lastly, his projections appear to be premised upon his ability to charge a delivery fee for all the alfalfa he sells, yet his past experience has been otherwise—he has not, in fact, charged a delivery fee for much of the alfalfa he has sold thus far, but has, rather, frequently achieved only the sale price of the alfalfa itself as gross income from both operations.

While the Court will generally allow that a debtor may alter his or her business by expanding into new and more profitable areas in order to effect a successful reorganization, and may further accord such debtors the benefit of the doubt in such endeavors, where such is warranted, the debtor cannot thereafter avoid the realities of his or her situation once turned bad. When the new enterprise or venture is based, from its inception, upon only a hope and a prayer, or when the new business rapidly proves not to resuscitate the debtor but rather speeds him to his financial end, the Court cannot turn a blind eye to the situation. Indeed, at that point, reality crushes the very prospect of reorganization.

Under all of the evidence presented, it is abundantly clear that Tofsrud has failed to meet his 1998 projections, and that he will in all likelihood fail to meet his future plan obligations. In sum, when Tofsrud's Amended Plan is analyzed under either his own actual performance figures for 1997 and 1998, or the NDSU-based projections for 1999 and 2000, it is clear that the plan will not cash flow. Accordingly, the Court can only find his Amended Plan to be unfeasible and, thus, unconfirmable.

### III. Ramsey Motions

 Ramsey filed a Motion to Convert or Dismiss, as well as an Amended Motion for Relief from Stay, on December 24, 1998. Ramsey bases the former motion upon, inter alia, the following grounds: (1) unreasonable delay; (2) failure by Tofsrud to file a timely plan; (3) denial of confirmation to all of Tofsrud's previously filed plans; (4) continuing loss or diminution to the estate; (5) the absence of a reasonable likelihood of rehabilitation, and in that connection, bad faith filing on the part of Tofsrud; and (6) Tofsrud's failure to schedule all of his assets, which Ramsey asserts constitutes the commission of fraud. In the latter motion, Ramsey moves for relief from stay pursuant to 11 U.S.C. § 362, such that it may repossess and foreclose upon, or otherwise obtain the possession of, personal property and livestock subject to its security interest, as well as real property subject to its mortgages. As grounds therefor, Ramsey states the following: (1) Tofsrud admits that he has no equity in machinery and equipment which is not necessary to his conduction of his alfalfa and livestock operations; (2) Tofsrud has not obtained insurance coverage for Ramsey's personal property, livestock, and vehicular collateral; and (3) Tofsrud has failed to pay real estate taxes on the real property securing Ramsey's claim. The Court finds sufficient cause to grant Ramsey the relief it requests under both Motions.

### IV. Conclusion

Based upon the foregoing, confirmation of the Amended Plan of the debtor, Glen A. Tofsrud, is DENIED. The Motion by Creditor Ramsey National Bank for Relief from Stay is GRANTED pursuant to 11 U.S.C. § 362. Finally, the Motion by Creditor Ramsey National Bank to Dismiss the Case is GRANTED.

**SO ORDERED.**