**In re Richard WEBER, Shelby Weber, Debtors.**

**Bankruptcy No. 02–02227.**

United States Bankruptcy Court, N.D. Iowa.

July 22, 2003.

Brian W. Peters, Dubuque, IA, for debtors.

James A. Garrett, Waukon, IA, Dale L. Putnam, Decorah, IA, for creditor.

## ORDER RE CONFIRMATION AND MOTION TO DISMISS

PAUL J. KILBURG, Chief Judge.

This matter came before the undersigned on June 11, 2003. Debtors Richard and Shelby Weber appeared with attorney Brian Peters. Carol Dunbar appeared as Chapter 12 Trustee. Attorney James Garrett represented Creditor Kerndt Bros. Savings Bank. Attorney John Schmillen appeared for the U.S. Trustee. After hearing evidence and arguments of counsel, the Court took the matter under advisement. The time for filing briefs has passed and this matter is ready for resolution. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (L).

### STATEMENT OF THE CASE

Two matters are before the Court: confirmation of Debtors' Fourth Amended Plan and Trustee's Motion to Dismiss. Trustee, Kerndt Bros. Savings Bank and Caledonia Implement filed objections to confirmation. Feasibility of the plan,

among other things, is at issue. The Bank and Caledonia object to treatment of their claims.

Trustee's Motion to Dismiss asserts Debtors have not been cooperating with Trustee. She argues the delays arising in this case are prejudicial to creditors. U.S. Trustee joins the Motion to Dismiss, citing Debtors' failure to timely file reports and to propose a confirmable plan. The Bank also joins in Trustee's Motion to Dismiss.

## FINDINGS OF FACT

Debtors filed their Chapter 12 petition on June 28, 2002. The have filed several amendments to schedules and five different versions of their plan. The Fourth Amended Plan was filed April 22, 2003. Debtors amended their entire petition on June 9, 2003, two days before this hearing on confirmation.

Debtor Richard Weber testified at the hearing. He asserted that debts in this case total $167,025, 83% of which arise from Debtors' farming operation. Mr. Weber stated that $37,981 of Debtors' 2001 income was from the farming operation, or 63% of their total gross income.

Debtors' Fourth Amended Plan provides for payments of $25,000 per year over a period of five years, paid semiannually at $12,500 in October and April. Mr. Weber testified these are the best times to sell livestock. So far, Debtors have made two payments to Trustee: 1) $250 at the beginning of their Chapter 12 case and 2) one plan payment of $12,500 which was due Jan. 31, 2003 and which Trustee received on Feb. 6, 2003. Mr. Weber testified he is current on plan payments and can timely make the payments proposed in his plan.

Debtors farm 156 acres, growing corn, hay, straw and oats. Thirty-one acres are used as pasture. Mr. Weber testified that all crops are planted and are in excellent shape. Debtors use their crops primarily to feed their livestock. Their grain and hay covers most of the feeding needs for their livestock. Occasionally, Debtors have a small surplus of crops to sell. Mr. Weber testified Debtors' farm has a value of $250,000. The recent amended schedules disclose a value of $200,000. Mr. Weber testified he is not willing to sell the farm in any circumstance. The Bank agrees that the farm has a value of $250,000. It argues that the equity cushion for its security interest in the farm is declining every day while this Chapter 12 case remains pending.

The sale of cattle generates most of Debtors' farming income. Mr. Weber testified that, generally, Debtors sell 26 head, more or less, from their cattle herd, twice a year. Debtors purchase replacement cows as calves, weighing between 200 and 400 lbs. They then fatten them up for sale at a market weight of between 1,500 and 1,700 lbs. Mr. Weber testified Debtors get approximately $1,000 per head at market. He further stated that out of each sale there would be enough funds to pay the semiannual plan payments and to buy replacements to sustain the herd. Also, Debtors handle some bred cows, using the calves to build up the herd. Mr. Weber testified he is trying to buy more cattle to increase the herd and increase sales.

On cross-examination, Mr. Weber testified he sold 26 head of cattle in February 2003 for approximately $17,000 and made a plan payment to Trustee out of the proceeds. This transaction represents an average sale price of $655 per head. Mr. Weber testified replacement cows would cost on average between $200 and $300. Debtors recently paid $16,000 for 42 replacement cows, or an average of about $380 per head. Mr. Weber admitted upon cross-examination that the Cash Flow

statement of his plan does not include an expense for the cost to replace cattle sold.

At the date of filing the Chapter 12 petition, Debtors' schedules listed 110 Holstein steers as their total livestock. On the petition filed two days before the hearing, they again listed livestock of 110 Holstein steers. Mr. Weber testified at the hearing that they currently have 65 Holstein steers and 15 beef cows with calves. On cross-examination, he testified regarding his purchase of 42 replacement cows a week or two prior to the hearing. Rather than the total of 80 previously testified to, Mr. Weber stated he has 42 plus 28 plus the 42 new replacement cows, which adds up to 112 head, not including 15 newborn calves he expects to be coming in. At another point in his testimony, Mr. Weber stated he now has 95 head of livestock.

Mr. Weber further testified, upon cross-examination by the Bank and by the Court, that he borrowed $17,900 from his son, Chris, to pay for the 42 replacement cows. He received this money through his son's deposit into Debtors' checking account one or two weeks before this hearing. Mr. Weber stated that he hoped to pay the money back someday. He testified his son told him he could pay back the money when he gets back on his feet financially. No writing memorializes this transaction. Debtor stated this was family business and was a private matter. He felt the Bank did not need to know. Debtors did not seek authorization from the Court or from Trustee to enter into this loan with their son. The proposed plan does not provide for repayment of this loan.

Debtor testified he currently has approximately $500 cash on hand. He is paying crop inputs as he can, with $4,200 remaining owing and due by the end of June 2003. Mr Weber testified he would sell some livestock if necessary to get the money. He asserts he can do this without cutting into plan payment funds.

In 2001, Debtors received government payments of $7,900. In 2002, this amount decreased to $3,000. Debtors listed monthly farm expenses at $440 in schedules amended in November 2002. They listed farm expenses at $3,037 in amended schedules filed in January 2003. On Schedule J filed June 9, 2003, monthly expenses from operation of their farm total $3,241.67. Debtors did not attach an itemization of these expenses as required. This amount, however, is one-twelfth of the annual expenses Debtors list on their Cash Flow chart attached as Exhibit "B" to their current plan, excluding "other family living expenses" of $22,056 annually.

Trustee, the Bank and the U.S. Trustee questioned Mr. Weber about the discrepancies between Debtors' actual income and expenses and those projected in the Plan's Cash Flow statement. Debtors' tax return reported income from cattle sales in 2002 of approximately $10,000. In the 2001 tax return, the Bank's Exhibit 1, gross income from cattle sales was $25,620. Debtors' plan projects $56,000 annual income from cattle sales during the life of the plan. Mr. Weber's explanation for the discrepancy was that he delayed sales until after the first of the year.

Debtors' 2001 tax return, Schedule F "Profit or Loss from Farming," includes expenses for supplies of $5,099, veterinary, breeding & medicine of $2,360, seeds and plants purchased of $3,851, fertilizers and lime of $5,370, and gasoline, fuel and oil of $4,535. These expenses are either missing from or are inconsistent with the amounts listed in Debtors' Cash Flow statement attached to the Plan. Mr. Weber's explanation for these discrepancies was that Schedule F and the Cash Flow were prepared for different purposes.

Mr. Weber testified that he was aware of the requirement of submitting monthly and annual financial reports to Trustee. Trustee received monthly reports for July through December 2002 on January 21, 2003. She received monthly reports for January through April 2003 on June 3, 2003, as well as Debtors' 2002 income tax returns. Debtor has not submitted an annual report for 2002. The monthly reports and the 2002 tax return have not been made a part of the record herein.

U.S. Trustee notes that Debtors' Cash Flow statement shows net revenue of $25,000. The cash flow projections do not include annual costs of between $16,000 and $22,000 to buy replacements for cattle sold. Also, the plan fails to provide for all expenses of Debtors' farming operation, including car and truck expenses, veterinary services and supplies. Mr. Weber testified that these are continuing expenses in the farm operation.

Trustee asserts that farm income is overstated and farm expenses are understated in Debtors' Cash Flow statement. She also argues that unsecured creditors would receive full payment in a Chapter 7 case. Thus, Debtors' plan fails to meet the liquidation analysis under § 1225(a)(4). Trustee maintains that the administration of this case has been thwarted by Debtors' inability or unwillingness to comply with the duties and requirements of Chapter 12 and to timely provide accurate financial information.

## CONFIRMATION

■ A chapter 12 debtor has the burden of proving that the proposed plan of reorganization meets all confirmation requirements. *In re Krause,* 261 B.R. 218, 222 (8th Cir. BAP 2001). One of the requirements for confirmation is that the debtor "be able to make all payments under the plan and to comply with the plan."

11 U.S.C. § 1225(a)(6). To determine the feasibility of a plan, the court must ascertain the probability of actual performance of the provisions of the plan. *In re Mosbrucker,* 227 B.R. 434, 437 (8th Cir. BAP 1998), *aff'd* 198 F.3d 250 (8th Cir.1999). Feasibility of a debtor's plan is a factual determination. *Id.*

■ This feasibility standard requires the Court to determine whether the plan offers a reasonable prospect of success and is workable. *In re Monnier Bros.,* 755 F.2d 1336, 1341 (8th Cir.1985); *In re Foertsch,* 167 B.R. 555, 565 (Bankr.D.N.D. 1994). The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts. *In re Clarkson,* 767 F.2d 417, 420 (8th Cir.1985).

■ The debtors' income and expense projections are considered in conjunction with their actual past performance to determine feasibility. *In re Euerle Farms, Inc.,* 861 F.2d 1089, 1090 (8th Cir.1988). "Because past behavior and productivity are excellent indicators of future production, courts have frequently rejected plans which are premised on highly optimistic projections of increased production." *In re Crowley,* 85 B.R. 76, 79 (W.D.Wis.1988). Courts generally grant debtors every reasonable benefit of the doubt in matters concerning plan feasibility in furtherance of the rehabilitative policies underlying the Code. *In re Tofsrud,* 230 B.R. 862, 872–73 (Bankr.D.N.D.1999). They will not, however, blindly confirm a plan which will not cash flow, and which is, therefore, unfeasible. *Id.*

■ Applying the foregoing to the facts in this case, the Court concludes Debtors have failed to prove that their Plan is feasible under § 1225(a)(6). The projections of income and expenses in Debtors' Cash Flow are not supported by Debtors' actual performance. Debtors' annual income from sales of cattle has fallen well

below the gross cattle sales Debtors project to be $56,000. Their government program income has also been reduced from $7,900 to $3,000. Expenses Debtors reported in the 2001 tax return are continuing and are not accurately reflected in Debtors' cash flow report. Debtors have failed to support the validity of the projected Cash Flow in light of the discrepancies between it and the 2001 tax return. The 2002 tax return has not been made part of the record. The Court has not been provided with Debtors' monthly reports.

The Court concludes that Debtors have failed to prove that their Fourth Amended Plan filed April 22, 2003 meets the feasibility requirement of § 1225(a)(6). Debtors' projected income and expenses are overly optimistic and not supported by historical or market data. The Fourth Amended Plan cannot be confirmed.

## DISMISSAL

■ Section 1208 of the Bankruptcy Code articulates the circumstances under which a bankruptcy court may dismiss a case. The court "may dismiss a case under this chapter for cause, including-(1) unreasonable delay ... by the debtor that is prejudicial to creditors; ... (5) denial of confirmation of a plan under section 1225 of this title and denial of a request made for additional time for filing another plan or a modification of a plan; ... and (9) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1208(c). These specifically articulated criteria are not exclusive. *In re Barger,* 233 B.R. 80, 84–85 (8th Cir. BAP 1999); *In re Euerle Farms, Inc.,* 861 F.2d 1089 (8th Cir.1988). The decision to dismiss a case is within the sound discretion of the bankruptcy court. *In re Brown,* 82 F.3d 801, 806 (8th Cir.1996).

■ Filing for Chapter 12 protection without the ability to reorganize renders the petition subject to dismissal. *Euerle Farms,* 861 F.2d at 1092. The Eighth Circuit affirmed dismissal in *Euerle Farms* where the debtor had proposed a problematic and unconfirmable plan with payments to creditors being conjectural at best. *Id.* In *In re Hirt,* 97 B.R. 981, 985 (Bankr.E.D.Wis.1989), the court found cause to dismiss a Chapter 11 farm reorganization where the case was over 10 months old and the record amply demonstrated the debtors' inability to effectuate a feasible plan.

■ Chapter 12 is designed to provide a relatively expedited resolution of a family farmer's disputes with its creditors. *Barger,* 233 B.R. at 85. Cause exists for dismissal where Chapter 12 debtors have had ample opportunity to propose a confirmable plan and have failed to do so. *In re Luchenbill,* 112 B.R. 204, 219 (Bankr. E.D.Mich.1990). Failure to file monthly reports or provide the Trustee with other required financial information can also be grounds for dismissal. *See In re Wilkins Inv. Group, Inc.,* 171 B.R. 194, 196–97 (Bankr.M.D.Pa.1994) (dismissing Chapter 11 case); *In re Gribbins,* 242 B.R. 637, 642 (Bankr.W.D.Ky.1999) (dismissing Chapter 12 case postconfirmation based, in part, on debtor's failure to file monthly reports), *aff'd* 43 Fed.Appx. 861 (6th Cir.2002).

■ The Court concludes that dismissal of this Chapter 12 case is appropriate. Debtors have filed more than four plans in the 12 months since they filed their petition. The failure to propose a confirmable plan is creating an unreasonable delay. 11 U.S.C. § 1208(c)(1). Confirmation has been denied twice. *Id.* at (c)(5). Further delay will result in diminution of the estate in the absence of a reasonable likelihood of rehabilitation. *Id.* at (c)(9).

Furthermore, as Trustee points out, Debtors have exhibited a lack of interest in timely submitting monthly and annual fi-

nancial reports and copies of tax returns. Because of this, Trustee and creditors are unable to make informed decisions concerning Debtors' ability to operate under a Chapter 12 plan.

The most blatant example of Debtors' refusal to comply with the responsibilities attached to a Chapter 12 filing is their unauthorized loan from their son for $17,900 just days before the confirmation hearing. This also underscores Debtors' inability to reorganize under Chapter 12 as their own income is insufficient to allow them to purchase replacements for cattle sold. Further delays in this case will increase the prejudice to creditors, with no assurance that Debtors will ever be able to propose a confirmable plan or successfully reorganize under Chapter 12.

**WHEREFORE,** confirmation of Debtors' Amended Chapter 12 Plan is DENIED.

**FURTHER,** this case is DISMISSED.